**INTERMOUNTAIN BUILDING & LOAN ASS'N et al. v. GALLEGOS et al.**

No. 7516.

Circuit Court of Appeals, Ninth Circuit.

Aug. 5, 1935.

Rehearing Denied Sept. 6, 1935.

973

H. Van Dam, Jr., of Salt Lake City, Utah, and James R. Moore and Blaine B. Shimmel, of Phœnix, Ariz., for appellants.

Elizabeth G. Monaghan and Thomas W. Nealon, both of Phœnix, Ariz., for appellees.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

GARRECHT, Circuit Judge.

From two interlocutory orders, one appointing a receiver pendente lite for all assets of the appellant Association situated in Arizona, and the other enjoining the appellant Malia from removing such assets from the state, the present appeal is being prosecuted.

A somewhat detailed chronicle of the pleadings is necessary for a proper understanding of the conflicting claims of the parties, particularly since the pleadings make up by far the bulk of the record.

Alleging that they were "express contract lien" creditors of the Association, the appellees Gallegos, Gudmundsen, and Dexter filed an amended bill of complaint in equity against the Association on June 23, 1933. The bill averred that it was filed on behalf of the plaintiffs and on behalf of others similarly situated; that jurisdiction was based upon diversity of citizenship, the appellees being citizens of Arizona and the appellant Association being a corporation organized under the laws of Utah, but maintaining offices in Phœnix, Ariz., and owning property in Arizona; that the aggregate amount of the debts due to all the plaintiffs-appellees was $6,715.50, exclusive of interest and costs; and that the amount due to the appellees Gallegos was $1,155.

The facts forming the basis of the Gallegos claim were set out as follows:

On February 23, 1924, in Yavapai county, Ariz., the appellees Gallegos purchased an "Installment Savings Certificate" from the Association, upon monthly payments of $11 each, and paid thereon a total of $1,155, being the equivalent of 105 payments of $11 each. The Association issued to those two appellees its "Installment Savings Certificate," dated February 26, 1924, for $2,000, payable at the expiration of 126 months from that date. No loan is out-

standing against that certificate, and no other certificate has been issued in lieu thereof.

The bill then sets out the certificate verbatim. The material recitals of that document are in substance as follows:

1. The issue is denominated variously "Installment Stock Certificate," "Installment Savings Stock Certificate," and "Installment Savings Certificate." The words, "Maturity Value $2,000—Number of Shares 20," appear at the top of the certificate.

2. In consideration of the payment by the appellees Gallegos of $11 monthly in advance, for ten and one-half years, the Association "promises to pay" to the record owner of the certificate, at the expiration of that period, at its general office in Salt Lake City, Utah, the sum of $2,000.

3. The certificate is issued subject to the provisions of the articles of incorporation and the by-laws of the Association.

4. Among the "Privileges and Conditions" set forth on the back of the certificate appear the following:

"Security. As security for the performance of the obligations of the Association hereunder, the Association will hold intact, subject to the constant examination and inspection of the banking department of the State of Utah, first mortgages on improved Real Estate in an amount equal to at least one hundred per cent of its liabilities hereunder, less the amount of any loans made on this and like certificates or any certificates issued in lieu hereof."

"Loan Value. Upon depositing this certificate with the Association as collateral security, the Association will lend up to * * * 90 per cent of the then withdrawal value," etc.

"Neither dividends nor interest shall be credited or allowed upon any certificate during the period that payments * * * [are] suspended," etc.

"It is agreed that unless otherwise ordered by the Board of Directors, not to exceed 50% of the money received by the Association on stock payments in any one month shall be used to pay cash and death withdrawal values on stock certificates, and it is agreed that loans on stock certificates may be made in the order of the filing of application."

The certificate contains a detailed "Schedule of Payments and Withdrawal Value." In the assignment forms that are included in the certificate, references are found to "the within shares of stock," "the shares of stock represented by this certificate," etc.

Details relative to the certificates acquired by the other original plaintiffs are then set out in the bill. Save for differences in names, dates, and figures, those details are similar to those with respect to the certificate held by appellees Gallegos.

The bill further alleges that the Association is insolvent, and that its liabilities exceed its assets by more than $400,000; that the assets of the Association are hopelessly "mingled and entangled" with the securities to which the appellees are entitled; that it is necessary that a receiver be appointed to make an equitable segregation and distribution of securities and recover securities "wrongfully disposed of" by the appellant corporation; that the controlling interest in the stock of the Association has been acquired by a rival corporation, and that the affairs of the Association "are being run in the interest of said rival corporation," etc.; that the Association has from its inception been mismanaged "hopelessly"; that the expenses incurred in the operation thereof have each year been far in excess of its income, after deduction from its gross income of the interest liability incurred by it on its obligations; that in no single year during its operation has the Association made its expenses; that as a consequence it has never accumulated any profits, and has been hopelessly insolvent for more than seven years; that despite the fact that the Association has thus been conducted at a loss for all of these years, it has declared and paid dividends to its stockholders; and that in no year since its inception has the maximum amount of income that it would have been entitled to collect from the mortgages and other securities which it owned, or of earnings derived from any other source, been sufficient to pay its expenses and the accumulated interest due to the plaintiffs and others similarly situated.

The bill alleges that the various plaintiffs complied fully with the terms of their respective contracts until certain dates in 1932 and 1933. On June 8 of the former year, the appellees Gallegos gave due no-

tice of their intention to withdraw, but the Association failed to carry out its contract, etc. As to the appellees Gudmundsen and Dexter, it is averred that, having fully complied with the terms of their respective contracts until March, 1933, on learning that the Association was insolvent they declined to make any further payments.

The Association has paid large sums of money to withdrawing certificate holders while it was insolvent, with the result that some of such holders have been paid in full while the appellees and those similarly situated "will receive under any circumstances" only a portion of the money due to them, according to the bill. It is also asserted that the Association has transferred many of its assets to other corporations and will continue to do so unless a receiver is appointed, etc.; that the Association is advertising that, together with other corporations known as "Intermountain Building and Loan Group," it has a paid-in capital surplus of more than $8,000,000, and is inducing the public to invest its money by such false representations, thereby imperiling the Association's assets and subjecting it to actions at law and suits in equity; that suits and actions have in fact been filed against the Association, and others are threatened; that many creditors will obtain judgments, etc.; that an "imperious necessity" exists that a receiver be appointed immediately and without notice to prevent such multiplicity of suits, etc.; that the Association is not functioning for the purpose for which it was incorporated; that it is doing practically no new business, or "any profitable business"; and that it has "lost the confidence of the public to such an extent that it can never be profitably conducted, and has lost all right to do any new business in Arizona."

The bill then sets out in extenso article VI of the articles of incorporation, as amended on October 18, 1921, dealing with the issue and nature of the Association's stock. Comparison of the text of the article as transcribed in the bill with the text as given in an exhibit attached to the answer of the Association, discloses that in 1924, when most of the original plaintiffs-appellees purchased their respective certificates, article VI had again been amended. Accordingly, we will defer a discussion of the articles of incorporation and their amendments.

The bill also contains a copy of article VII, dealing with the conditions under which directors may be elected, etc.

The bill prays for the immediate appointment of a receiver, to avoid the loss of $6,000 per month "that is now being expended as expenses of the defendant in excess of its monthly earnings"; to take possession of the real estate owned by the Association in Arizona, etc. The appellees also pray for an accounting between the Association and each of them, to ascertain the amounts due to them from the Association; for the establishment of liens upon the real mortgages; for a temporary restraining order enjoining the Association and its agents from removing, concealing, etc., its property now in Arizona, etc.

In its answer, the appellant Association alleged that the bill fails to set forth facts sufficient to constitute a cause of action, either at law or in equity, and averred that the Bank Commissioner of the State of Utah has the exclusive power to appoint a receiver for the Association, and has exclusive jurisdiction over its internal affairs. A Utah statute is quoted in part to sustain that contention.

The answer admits that the certificates were issued to the appellees as alleged in the bill, but denies that the certificates created a lien, as claimed by the appellees. The Association asserts that the appellees and all others similarly situated are stockholders and not creditors, and denies that it has failed to carry out its contract with the appellees. The answer points out that the contracts themselves and the by-laws specifically provide that not more than one-half of the funds received by the Association in any one month shall be applicable to the payment of withdrawing members, and alleges that since the date when the appellees applied for withdrawal, there have never been sufficient funds to pay the withdrawals on file, as provided by the by-laws.

Since many of the allegations of the voluminous answer were specifically abandoned by admissions in open court and many others have been tacitly abandoned on this appeal, it is unnecessary to set forth the Association's pleadings in greater detail.

Annexed to the answer as exhibits are copies of the Association's by-laws and ar-

ticles of incorporation. Dealing with withdrawals, article 15 of the by-laws provides that any holder of "Investor's Guaranteed Dividend Stock may withdraw from the Association at any time after thirty-six months after purchase thereof, upon giving thirty days' notice in writing." Other pertinent provisions of the by-laws have already been set out herein, as part of the certificates or as part of the Association's answer.

Nowhere in the articles of incorporation or in the amendments thereto can there be found any authorization for the issuance of stock designated "Installment" or "Installment Savings." The nearest approach to any such security is the "Investor's Guaranteed Dividend Stock."

Article IX of the charter, however, as it stood at the time the appellees purchased their certificates, contained the following provision: "3. So long as the maximum rate of interest as provided under the laws of the State of Utah shall be 12% per annum, the Investor's Guarantee Dividend Stock Fund shall be credited from earnings with 8% per annum interest, compounded semi-annually, upon the total amount standing to the credit of such stock on the books of the corporation, which amount or book value shall be all moneys paid in said Investor's Guarantee Dividend Stock less all moneys paid thereon into the other funds of the corporation. Should the maximum rate of interest as allowed by the State of Utah be reduced below the present maximum rate of 12% per annum, then said guarantee of 8% per annum, compounded semi-annually, shall be reduced 1% for each 1% of the said maximum rate," etc.

The certificates issued to the appellees contained no such provision that the interest thereon was to be paid out of earnings. On the contrary, the inference is clear that, on maturity or on withdrawal, the amount due was to be paid in any event. Indeed, as we shall see later, in the certificates issued to the intervening appellees, such amount was specifically said to be "guaranteed."

At the time that the foregoing amended bill was filed, there was in force an amended restraining order, filed May 11, 1933, enjoining the Association from removing its records from the state of Arizona. That order was entered by the court below as a result of the original bill filed by the appellees, on April 18, 1933. The original bill is not part of the record before us, and need not be considered here.

On May 19, 1933, the appellees Smoot filed a bill in intervention, alleging that they were appearing on their own behalf and on behalf of others similarly situated. Like the plaintiffs-appellees that had filed the amended complaint, the interveners alleged that they were contract creditors of the Association, holding an express lien. They set out verbatim a document variously denominated an "Installment Savings Stock Certificate" and "Installment Savings Certificate" containing provisions closely similar to those forming part of the certificates relied upon by the other appellees. The interveners' certificate, however, carried different terms as to loan values, not material here, and contained two provisions not found in the certificates held by the appellees Gallegos, Gudmundsen, and Dexter. Those provisions were as follows:

"Additional Earnings. The holders of this certificate *in addition to receiving the return herein guaranteed* shall participate in all such dividends as may be declared by the Board of Directors from the additional earnings of the Association, which dividends will hasten the maturity of the certificate.

"Rider Attached to Certificate.

"In the event of death, of the permanent disability of the legal owner of this certificate and provided the installment payments have each been made promptly as due, *we will pay* to the legal representative on demand within thirty days after receipt by us of satisfactory proof of death, all monies paid on this certificate *plus interest* at the rate of six per cent per annum." (Italics our own.)

The other allegations of the interveners' bill were substantially similar to those of the bill filed by the other appellees herein.

On September 26, 1933, the appellant Malia filed in the court below a petition to intervene. Setting forth verbatim numerous provisions of Utah law, the Bank Commissioner alleged that he had made a written demand upon the president and the directors of the Association to return to the state of Utah the corporation's records; that the officers had advised him that they were unable to comply

with his demand because of the restraining order referred to above; that by virtue of the laws of Utah he is vested with exclusive jurisdiction of the affairs of the Association, to the exclusion of the court below, or of any other court; that as a matter of equity he is better able to manage the affairs of the Association than is the court, etc.

In his petition, Malia alleged that the Association "since 1921, has conducted a successful building and loan business throughout several states of the Union," under the supervision of the Bank Commissioner. This allegation is of interest when compared with an affidavit filed in the court below by James A. Smith, a certified public accountant, on April 18, 1933, in which Smith averred that the Association's records showed it to have been insolvent for more than seven years. This statement, however, was denied in an affidavit filed by A. J. Bruneau, director, secretary-treasurer, and general manager of the Association.

The court below denied the appellant Malia's petition for leave to intervene, in an order entered on November 22, 1933. By another order, entered on January 3, 1934, the court again in effect denied Malia's petition for leave to intervene, by granting the appellees' motion to dismiss his petition.

On March 23, 1934, the appellant Malia again filed a petition for leave to intervene. He alleged that on March 17, 1934, pursuant to the laws of Utah, he took possession of the business and property of the Association at Salt Lake City and Phœnix; that it is to the best interests of the depositors, creditors and stockholders of the Association that the supervision and the further conduct of the business be under his direction, etc.

On March 27, 1934, the appellees Gallegos and Gudmundsen moved to dismiss Malia's petition to intervene.

On March 31, 1934, after having obtained permission of the court, Malia filed an amended petition for leave to intervene, in which he alleged, inter alia, that:

1. Prior to March 17, 1934, he had notified the Association that it was, in his opinion, conducting its business illegally and was "pursuing a plan injurious to the interest of the shareholders."

2. Since March 17, 1934, when he took possession of the Association's business and property, there has been "urgent necessity" for the continuance by him of some of the pending business transactions of the Association, particularly in the matter of the liquidation of its mortgage loans through the agency of the Home Owners' Loan Corporation.

3. Among the assets of the Association in Arizona is a sum on deposit in a Phœnix bank, "which money said bank refuses presently to pay out upon the check of petitioner * * * for the reason * * * that said bank is apprehensive of transgressing the terms of said amended restraining order."

This last petition filed by Malia reiterated certain allegations contained in his prior pleadings, already summarized herein.

On April 4, 1934, the appellees Gallegos and Gudmundsen filed a petition for the appointment of a temporary receiver. The petition referred to the restraining order theretofore entered, and alleged: "That * * * on or prior to, to-wit, March 22, 1934, the defendant herein, in violation of the order of this court, and in contempt of said Court, suffered and permitted the said J. A. Malia to take possession and control of all the assets of the defendant * * * in Arizona; that this was done over the protest, and contrary to the advice of the solicitors and counsel of the defendant, who sought to protect the possession of this court * * *."

The petition also averred that the appellant Malia is seeking the control of the Association's property for the avowed purpose of taking it out of the jurisdiction of the court below and surrendering its control "to the officials of the defendant corporation who are responsible for the unsound condition of the corporation and its unsafe operations, after the removal of the officers who have resisted a violation of the restraining order heretofore issued by the court"; that Bruneau was one of the officers who had "endeavored to protect the possession of" the court below and to prevent the violation of the restraining order theretofore issued; and added: "That said J. A. Malia is not a fit and proper person to have the custody of the assets of the defendant corporation, as he is without the jurisdiction of this Court, not responsible thereto, has no bond enforcible in this jurisdiction to protect the interests of the

plaintiffs and others similarly situated, and would not be under the supervision of this Court; and that, as heretofore demonstrated and as appears from the records and files herein, he is negligent in his supervision thereof and lacking the qualities necessary to a proper administration of its affairs, and that he has for a long period of time suffered and permitted said corporation to continue business in an unsafe and unsound condition when he had access to their records and could by the use of ordinary diligence, have discovered the condition of its affairs."

On April 6, 1934, the interveners-appellees Smoot joined in the petition for the appointment of a temporary receiver.

On or about April 10, 1934, the appellants filed a joint "answer and objections" to the petition for the appointment of a temporary receiver. In their answer, the appellants admitted that the directors of the Association had permitted Malia to take possession of all of its assets; specifically denied that such possession was taken over the protest of the Association's counsel; denied that the appellants were in contempt of court; denied that Malia's purpose in seizing the Association and its assets was to remove them from the jurisdiction of the court and to return them to the officers of the Association; alleged that Malia had seized the assets by virtue of the laws of Utah, for the purpose of conserving them, or to permit the investors to reorganize the Association, according to law, "if such should become desirable"; admitted that the Association's assets in Malia's possession would not be under the supervision of the Court below, but denied that he was unfit, negligent, etc.; alleged that Malia has conferred with the building and loan officials of the five other states in which the Association has operated, which officials have supervision of the Association as an operating entity and have supervision of three other affiliated associations having interlocking stock holdings with the appellant Association; alleged that these interlocking relations present a problem that should be worked out by the building and loan officials having supervision of the Association; and denied that he was planning to take the assets of the Association out of the jurisdiction of the court below and surrendering them to the officials of the Association responsible for its unsound condition, etc.

As an affirmative defense, the appellants averred that "the supervising court having jurisdiction of the said Bank Commissioner [in Utah] has assumed jurisdiction and supervision of the said suspension and liquidation of the said Association"; that the most convenient and the most economical way of distributing the assets of the Association to all investors, in whatever State such assets may be situated, "is through the liquidator at the domicile of the corporation," etc.; that it appears on the face of the amended bill of the original plaintiffs and on the face of the intervener's bill, "that each of them is wholly without equity"; that this is an attempt by simple contract creditors, who have not reduced their claims to judgment, to obtain a receiver; that this is a proceeding in rem for the possession of property which is already in possession of a statutory state liquidator, etc.; and the court below was without jurisdiction to appoint a receiver.

In stating their affirmative defense, the appellants set out a table showing the book value of the Association's assets and liabilities and the number of its members or investors in the several states in which it did business prior to March 17, 1934. The table discloses that both the assets and the liabilities in Arizona are far greater than those in any of the other states, including Utah.

The answer ends with a prayer that the court below enter an order surrendering to Malia, in his official capacity, all possession that the court below may have of the Association's assets, so that the affairs of the Association may be wound up by him under the jurisdiction of the Utah court.

Attached to the answer of the appellants is a copy of an order filed in the Third judicial district court for the county of Salt Lake, Utah, declaring that, on petition of Malia, that court assumed jurisdiction "of the suspension, conservation, and/or liquidation" of the appellant Association, etc. The order, which was filed on April 6, 1934, in the Utah court, recites that the Association, through its president, had filed its written consent to the proceedings.

On April 10, 1934, the court below entered an order directing Malia to leave all the records and property of the As-

sociation in Arizona, "and not remove them." That is one of the orders from which the present appeal is being prosecuted.

On the same day, the following admissions, inter alia, were made in open court by counsel for the Association and Malia:

"6. That since the 17th day of March, 1934, there has existed a necessity for the administration of the affairs of the defendant corporation by J. A. Malia or some judicial officer. * * *

"8. That within five days after he had notice of this proceeding he did not take possession of the assets of the defendant nor take any proceedings to reduce them to his possession."

In connection with admission No. 8, it should be observed that section 7-2-5 of the Revised Statutes of Utah 1933 provides in part as follows: "No receiver shall be appointed by any court nor shall any deed of assignment for the benefit of creditors be filed in any district court within this state for any bank or other institution under the jurisdiction of the bank commissioner, except upon notice to the bank commissioner, unless in case of urgent necessity it becomes in the judgment of the court necessary so to do in order to preserve the assets of such institution. The bank commissioner may within five days after the service of such notice upon him take possession of such institution, in which case no further proceedings shall be had upon such application for the appointment of a receiver," etc.

■ The original bill herein was filed on April 18, 1933. The 1933 Code of Utah became effective on June 26, 1933. Malia took possession of the Association on March 17, 1934. The new Code had therefore been in effect nearly nine months before the Commissioner tardily took possession of the Association's assets, long after the federal court had assumed jurisdiction. Even if we were to hold, which we do not, that, as the appellants contend, the Utah statutes provide that a federal court may not "entertain" the present suit, Malia did not act seasonably.

Continuing our survey of the proceedings below, we find that on April 20, 1934, the lower court denied Malia's petition for leave to intervene, granted the intervention petition of the Smoots, and

made an order appointing a receiver pendente lite. That is the other order from which the present appeal has been taken.

In addition to the voluminous pleadings, the court below had before it several affidavits relative to the statements and reports of the Association filed in the office of the Bank Commissioner of Utah. The reports themselves, for the years from 1921 to 1932, also form part of the transcript. We have already adverted to the affidavits by Smith and Bruneau.

The assigned errors here relied upon by the appellants are briefly as follows:

1. That both the amended bill of the original plaintiffs and the bill of the interveners are without equity.

2. That the court abused its discretion in appointing the receiver and in restraining the appellant Malia from removing the Association's records and property out of Arizona.

3. That in making the two orders appealed from, the court denied full faith and credit to the statutes and judicial proceedings of Utah.

The first point to be considered is jurisdictional. The appellants contend in their brief that the appellees are stockholders, or at most unsecured creditors, and that therefore, under the circumstances of the instant case, they cannot bring suit for the appointment of a receiver.

■ The appellants quote copiously from the statutes of Utah in connection with their argument that the appellant Malia, as Bank Commissioner of the state, has exclusive jurisdiction over the affairs of the appellant Association. We need not pause to consider these statutes, however, since it is well settled that a State cannot limit the powers of a federal equity court.

In Penn General Casualty Co. v. Pennsylvania ex rel. Schnader, 294 U. S. 189, 197, 55 S. Ct. 386, 390, 79 L. Ed. 850, decided by the Supreme Court on February 4, 1935, Mr. Justice Stone said: "Its authority as a federal court to entertain the suit is not restricted by the procedure established by local statutes for the liquidation of insurance companies. The jurisdiction conferred on the District Courts by the Constitution and laws of the United States cannot be affected by state leg-

islation. See No. 394, Commonwealth of Pennsylvania v. Williams et al., decided this day, 294 U. S. 176, 55 S. Ct. 380, 79 L. Ed. 841 [96 A. L. R. 1166]."

See, also, Pusey & Jones Co. v. Hanssen, 261 U. S. 491, 497, 498, 43 S. Ct. 454, 67 L. Ed. 763.

Under certain circumstances, even a stockholder may ask for the appointment of a receiver by a federal court. In Burnrite Coal Briquette Co. v. Riggs, 274 U. S. 208, 212, 47 S. Ct. 578, 579, 71 L. Ed. 1002, Mr. Justice Brandeis said: "A federal district court may, under its general equity powers independently of any state statute, entertain a bill of a stockholder against the corporation for the appointment of at least a temporary receiver in order to prevent threatened diversion or loss of assets through gross fraud and mismanagement of its officers."

In any event, the objection that the appellees are stockholders would not, even if valid, "go to the jurisdiction of the District Court as a federal court, but only to the propriety of its action as a court of equity." Pennsylvania v. Williams, supra, 294 U. S. 176, at page 181, 55 S. Ct. 380, 383, 79 L. Ed. 841, 96 A. L. R. 1166.

Taking the certificates in question by their four corners, however, we cannot reach the conclusion that the appellees are stockholders in the Association.

In the first place, they were not to share in the profits, as such; they were to receive the withdrawal or maturity values of the certificates in any event, without reference to the fund out of which payments were to be made.

■ The right to share in the profits of the corporation is one of the badges of a stockholder. In 14 C. J. 800, 844, the rule is thus stated:

"With the exception of dividends in liquidation, dividends can be declared and paid out of net profits only, or conversely stated, when the payment thereof does not impair the capital stock of the corporation. * * *

"The principal rights of stockholders in ordinary business or trading corporations are to attend and vote at corporate meetings, to take part in the election of directors, to participate in dividends and profits * * *."

Secondly, the articles of incorporation and the by-laws contain no provision for the issuance of "Installment Savings" or any similar stock. Therefore had the certificates been issued as evidences of stockholding, such issue would have been ultra vires. We have already analyzed the facts in this connection, and there is no need to rehearse them here.

Finally, if the appellees were to be considered stockholders at all, they would undoubtedly be preferred stockholders, for their certificates clearly purport to give them a contract lien on the Association's securities, namely, its first mortgages on improved real estate.

■ It is fundamental that a building and loan association may not issue preferred stock. In 4 R. C. L. 350, we find the following language: "The pledge of the assets of a building association for the retirement of a certain class of its stock, in preference to others, is so violative of the elementary requirements of equality and mutuality as to be absolutely void."

See, also, Sumrall v. Commercial Bldg. Trust's Assignee, 106 Ky. 260, 50 S. W. 69, 71, 72, 44 L. R. A. 659, 90 Am. St. Rep. 223; Latimer v. Equitable Loan & Investment Co. (C. C.) 81 F. 776, 782.

The appellants not only concede this point, but insist upon it, as tending to establish the fact that the appellees have no lien on the Association's assets.

We are therefore confronted by the following legal situation: On the one hand, it is contended that the pledge of the Association's assets as security for the payment of the face value of the certificates is void, as giving an improper preference to "stockholders." On the other hand, it is argued that the certificates are evidences of debt, secured by the Association's assets, and that the holders of such certificates are creditors.

■ All corporations have the inherent right to borrow money and give security therefor. This inherent right is specifically recognized by statute in Utah. Section 18-2-16 of the Revised Statutes provides:

"The corporation in its name shall have power: * * *

"(7) To buy, receive, use, sell, mortgage, lease or bond, or otherwise dispose of, all such real estate as may be necessary, useful or desirable for it to own, use or dispose of for its purposes. * * * When the articles of incorporation provide that the property of the corporation may be sold, mortgaged or oth-

erwise disposed of by the directors or by the stockholders, sales, mortgages or other disposition of property made in accordance therewith shall be binding upon the company."

Article V of the Association's charter reads in part as follows: "Section 1. The purpose for which said Association is formed and the character of its business shall be to provide a loan and investment fund by sale of stocks, bonds, certificates, and other securities, the same to be paid for in single payments or by installments; to make loans to its members on a monthly payment plan of principal and interest; to borrow and receive money for loan purposes and handle contracts, stocks, bonds, and other securities for same; or others [sic] and to sell, loan, mortgage, and otherwise contract with reference thereto."

■ It is well setttled that in cases where one interpretation of a contract will render it valid, and another construction will compel the conclusion that it is void, the courts will favor the interpretation that will give life, and not death, to the agreement of the parties. The doctrine is simply a corollary to the presumption of validity. In Selby v. Bass, 19 La. 499, 506, the principle was thus stated: "When a party, having two capacities, takes possession of property, and a question arises as to which he holds under, it is a legal presumption, he takes in the capacity the law authorizes. That is, he will do what it is his duty to do. Omnia rite esse acta. 2 Starkie, 673."

And in the case of In re Darrow's Estate, 64 Misc. 224, 118 N. Y. S. 1082, 1085: "Where a situation is explainable on the basis of legality, it will be assumed that such is the explanation."

See, also, Osborn v. Weldon, 146 Mo. 185, 47 S. W. 936, 938; Muster v. Chicago, M. & St. P. Ry. Co., 61 Wis. 325, 21 N. W. 223, 224, 50 Am. Rep. 141; Solomon v. Dreschler, 4 Minn. 278 (Gil.) 197, 201; 22 C. J. 147–148.

■ It is true that the certificates in question contain the words "stock" and "shares." But it is axiomatic that the character of contracts is determined by their provisions, and not by their labels.

■ The certificates that we are here considering plainly purport to create a debtor-creditor relation. There is a definite promise to pay a sum certain, at the expiration of a given time, without designation of the fund out of which the payment is to be made.

In Barrymore v. Kemp (C. C. A.) 69 F.(2d) 335, 339, certiorari denied, 293 U. S. 566, 630, 55 S. Ct. 77, 79 L. Ed. ——, this court had before it certificates similar to those that we are now considering, save that no contract liens were there created. The appellant offered to deposit with a building and loan association the sum of $50,000, and other sums of money, on condition that he be allowed to withdraw from such deposits amounts of $10,000 or more on sixty days' notice to said association, and on the further condition that he be paid interest at the rate of 7 per cent. The offer was accepted. Of such a contract we said: "The finding that appellants are investment certificate holders or depositors of the respondent association is supported by the evidence. As such they are creditors of the association and entitled to share pro rata only with other general creditors on a distribution of the assets of the association. [Many cases cited.]"

See, also, Bettle v. Republic Savings & Loan Association, 71 N. J. Eq. 613, 617, 64 A. 176.

In the instant case, the Association "promises to pay" "at the expiration of" ten and one-half years, "upon presentation and surrender of this certificate, properly endorsed," "Two Thousand Dollars, legal tender money of the United States of America." The contract comes within the classic definition of a promise to pay a sum certain, and indubitably creates the relation of debtor and creditor. Nor do the provisions as to withdrawals alter that relationship.

Next to be considered is the defense of the appellants that even if the appellees are creditors, they are not secured creditors and therefore "were not entitled to appointment of a receiver until they had reduced their claims to judgment and execution had been issued and returned nulla bona." While there are certain limitations to the general rule relied upon by the appellants, we will assume that the appellees would not have had the right to maintain the instant suit had they been merely unsecured creditors. Pusey & Jones Co. v. Hanssen, supra, 261 U. S. 491, at page 500, 43 S. Ct. 454, 67 L. Ed. 763.

982

■ The appellees, however, are contract lien creditors, and therefore need not first reduce their claims to judgment before bringing suit for the appointment of a receiver. "A receiver is often appointed upon application of a secured creditor who fears that his security will be wasted." Pusey & Jones Co. v. Hanssen, supra, 261 U. S. 491, at page 497, 43 S. Ct. 454, 455, 67 L. Ed. 763.

The appellees' certificates contain emphatic provisions as to "security," which have already been quoted herein. The appellants point to no good reason why we should disregard the plain terms of the contracts subsisting between the Association and its creditors.

We hold, therefore, that the court below, as a chancery tribunal, had jurisdiction over the controversy and was empowered to appoint a receiver.

■ We turn next to the defenses that, in making such appointment, the court abused its discretion, and that it denied full faith and credit to the statutes and judicial proceedings of the state of Utah. As indicated in the appellants' opening brief, these two defenses are closely related to the objection of want of equity, and may be considered together.

In support of these defenses, the appellants, in their reply brief, cite three recent decisions of the Supreme Court. We believe that those decisions are not applicable to the facts of the instant case and that, on the contrary, they lay down certain general propositions opposed to the appellants' contentions.

In Pennsylvania v. Williams, supra, for instance, the court said, 294 U. S. 176, at pages 182, 183, 55 S. Ct. 380, 383, 79 L. Ed. 841, 96 A. L. R. 1166: "2. The question remains whether, in the special circumstances of the case, the District Court rightly retained its jurisdiction. The relief prayed in the bill of complaint is equitable in its nature, and the prayer was addressed to the sound discretion which is the controlling guide of judicial action in every phase of a suit in equity. The relief sought, an injunction and the appointment of receivers, was aimed at the prevention of irreparable injury, from the waste of the assets of the insolvent corporation which would ensue from a race of creditors to secure payment of their claims by forced sale of the corporate property. By local statutes elaborate provision is made for accomplish-

ing the same end, through the action of a state officer, in substantially the same manner and without substantially different results from those to be attained in receivership proceedings in the federal courts. *There is no allegation or contention that the procedure thus provided is inadequate, or that it will not be diligently and honestly followed.* In such circumstances the discretion of the District Court, invoked by the petition of the commonwealth, should have been exercised to relinquish the jurisdiction in favor of the statutory administration of the corporate assets by the state officer." (Italics our own.)

The italicized portion of the foregoing excerpt at once distinguishes the Williams Case from the one at bar. While Malia's honesty is not questioned, his diligence is most vigorously impugned. Not only from the copious pleadings but also from the various affidavits filed herein, the chancellor was amply justified in acting to conserve the assets of the Association. The corporation is admittedly insolvent, and there are sworn statements in the record to the effect that this insolvency had existed for more than seven years prior to the filing of the suit.

On September 26, 1933, Malia filed a sworn petition in the court below, averring that since 1921 the Association had "conducted a successful building and loan business throughout several states of the Union under the supervision of the Bank Commissioner of the State of Utah."

On April 10, 1934, Malia's counsel formally admitted to the court below that the Association, prior to March 17, 1934, "was conducting its business irregularly and in violation of its Articles of Incorporation and By-Laws, as shown by the pleadings in the proposed intervention, and that those pleadings also disclose that defendant was pursuing a policy injurious to its stockholders."

We are not informed by the appellants how long "prior" to March 17, 1934, the Association was conducting its business irregularly. In any event, giving the appellants the benefit of all the intendments, within less than six months there must have occurred the violent change from thrift to waste, from management to mismanagement, from success to failure.

With all these verified pleadings, affidavits, and admissions before it, the court below might well have arrived at the

conclusion that the corporate chaos had been a matter of years rather than months, and that therefore the Bank Commissioner of Utah, in whose office admittedly there were filed reports containing "full information as to the status of the defendant corporation," had shown himself not to be a proper person to husband the dwindling assets of the failing Association.

We cannot say that, as a matter of law, the chancellor erred in reaching such a conclusion.

█ Finally, there is another consideration that completely disposes of the appellants' contentions. In Clark v. Williard, 294 U. S. 211, 212, 55 S. Ct. 356, 357, 79 L. Ed. 865, decided on February 4, 1935, the Supreme Court held that on the question "whether there was any local policy, expressed in statute or decision, whereby the title of a statutory successor was to be subordinated to later executions at the suit of local creditors," the Supreme Court of the state "would speak the final word." In that case the court said, 294 U. S. 211, at pages 213, 215, 55 S. Ct. 356, 357, 79 L. Ed. 865:

"Every state has jurisdiction to determine for itself the liability of property within its territorial limits to seizure and sale under the process of its courts. * * *

"Iowa may say that one who is a liquidator with title, appointed by her statutes, shall be so recognized in Montana with whatever rights and privileges accompany such recognition according to *Montana* law. For failure to give adherence to that principle, we reversed and remanded when the case was last before us. [292 U. S. 112 (54 S. Ct. 615, 78 L. Ed. 1160).] Iowa may not say, however, that a liquidator with title who goes into Montana may set at naught Montana law as to the distribution of Montana assets, and carry over into another state the rule of distribution prescribed by the statutes of the domicile." (Italics our own.)

The Supreme Court of Arizona has spoken "the final word" on this subject. In Maconchy v. Delehanty, 11 Ariz. 366, 369, 370, 95 P. 109, 111, 17 L. R. A. (N. S.) 173, 21 Ann. Cas. 1038, that court

said: "Professor Minor, in his recent work on Conflict of Laws, at page 322, thus states the principle: 'But it does not follow, because ex proprio vigore the assignment has no extraterritorial effect, that no such effect is under any circumstances to be accorded it. On the contrary, except with respect to land, the general rule of comity is to recognize the title conferred by the lex domicilii upon the assignee in every state where the insolvent's property may be located, save only where the interests of the forum or of creditors require that it be disregarded. Hence, if the case does not affect creditors in the forum, but merely relates to the title of the assignee and his right to collect and sue for debts due the insolvent, the transfer to the assignee under the lex domicilii is sustained.' "

After thus quoting from Professor Minor, the Supreme Court of Arizona significantly added: "According to all the authorities, however, comity will not prevail to the extent of giving effect to a foreign statutory conveyance of real estate."

The Maconchy Case was cited with approval by the Supreme Court of Arizona, in Home Ins. Co. v. Latimer, 33 Ariz. 288, 293, 264 P. 103.

In its answer, the Association admits that it owns real estate of the value of $209,714.46 in the state of Arizona. It is also admitted that the Association's assets of all kinds in Arizona are greater than those in any other state, including Utah.

In appointing a receiver pendente lite over all property, both real and personal, of the Association, situate in Arizona, the court below was not only performing its duty as a court of equity, but was carrying out the public policy of the state. The Supreme Court of that commonwealth in the Maconchy Case, supra, has clearly indicated that not only as to real property, but as to personal property as well, "the general rule of comity" recognizing "the title conferred by the lex domicilii upon the assignee," etc., does not apply "where the interests of the forum or of creditors require that it be disregarded."

Accordingly, the orders of the court below are affirmed.