BRASHEAR et al. v. INTERMOUNTAIN BUILDING & LOAN ASS'N et al.

No. 9130.

Circuit Court of Appeals, Ninth Circuit.

Feb. 20, 1940.

Rehearing Denied April 9, 1940.

Thomas W. Nealon, Alexander B. Baker, Louis B. Whitney, and Lawrence L. Howe, all of Phoenix, Ariz., and Zach Lamar Cobb and Earl A. Littlejohns, both of Los Angeles, Cal., for appellants.

James C. Ingebretsen, of Los Angeles, Cal., for appellees, Evans, Building & Loan Commissioner State of California.

Earl Warren, Atty. Gen., and Frank Richards, Deputy Atty. Gen., for appellee Johnson, State Treasurer of California.

Before WILBUR, MATHEWS, and STEPHENS, Circuit Judges.

MATHEWS, Circuit Judge.

This appeal is from a decree of the District Court for Southern California which, after final hearing, dismissed the bill of complaint in a suit for the appointment of ancillary receivers of the property of Intermountain Building & Loan Association, a Utah corporation (hereafter called Intermountain), situate in California.

Organized in Utah, Intermountain did business in California and Arizona. In California, it was subject to the California Building and Loan Association Act[1] and was under the supervision and control of the California Building and Loan Commissioner. On March 29, 1934, it appearing to the Commissioner (Friend W. Richardson) that Intermountain was conducting its business in an unsafe manner, the Commissioner took possession of Intermountain's property in California, pursuant to § 13.11 of the Act.[2] Thereafter, pursuant to §§ 13.13[3] and 13.16[4] of the Act, the Commissioner proceeded to liquidate Intermountain's affairs in California. Such liquidation was in progress when this suit was commenced, February 27, 1936.

Plaintiffs in this suit (hereafter called the Brashear suit) were Julius G. Brashear, Charles E. Griggs and wife, Henry S. Mc-

---

[1] Stats.1931, p. 483, and amendments thereof.

[2] Stats.1931, p. 539.

[3] Stats.1931, p. 540; Stats.1935, p. 1507.

[4] Stats.1931, p. 541; Stats.1933, p. 2719; Stats.1935, p. 1500.

Cluskey and George A. Mauk. Brashear and the Griggs claimed to be secured creditors of Intermountain. Each of their claims exceeded, exclusive of interest and costs, the sum of $3,000. McCluskey and Mauk were receivers of Intermountain's property in Arizona, having been appointed as such by the District Court for Arizona in a suit (hereafter called the Gallegos suit)[5] by Guadalupe R. Gallegos and others against Intermountain. While the Brashear suit was pending, Harry W. Hill succeeded McCluskey and Mauk as receiver of Intermountain's Arizona property and was substituted as plaintiff in the Brashear suit. All plaintiffs in the Brashear suit were citizens of Arizona.

Defendants in the Brashear suit were Intermountain, Charles G. Johnson and Louis C. Drapeau. Johnson was and is State Treasurer of California. Drapeau was Building and Loan Commissioner of California, [6] but, while the Brashear suit was pending, Justus E. Craemer succeeded Drapeau as such Commissioner and was substituted as defendant. Intermountain was a citizen of Utah. Johnson, Drapeau and Craemer were citizens of California. After this appeal was taken, Ralph W. Evans succeeded Craemer as Building and Loan Commissioner and was substituted as appellee. Thus the parties now before us are Brashear, the Griggs and Hill as appellants and Intermountain, Johnson and Evans as appellees.

Section 13.11 of the California Building and Loan Association Act (Stats. 1931, p. 539)[7] provided: "If it shall appear to the commissioner that any association is * * * conducting its business in an unsafe or injurious manner such as to render its further proceeding hazardous to the public or to any or all of its investors * * * the commissioner may forthwith demand and take possession of the property, business and assets of such association and retain such possession until such association shall with the consent of the commissioner resume business, or until its affairs be liquidated." Proceeding under this section, the Commissioner took possession of Intermountain's California property[8] on March 29, 1934, 22 months and 29 days before the Brashear suit was commenced. Intermountain never resumed business in California. Consequently, possession of Intermountain's California property was, and still is, retained by the Commissioner.

Section 13.12 of the Act (Stats. 1931, p. 540)[9] provided: "Whenever any association of whose property, business and assets the commissioner has taken possession, as aforesaid, deems itself aggrieved thereby, it may at any time within thirty days after such taking possession apply to the superior court of the county in which the principal office of such association is located, [10] to enjoin further proceedings; and said court after citing the commissioner to show cause why further proceedings should not be enjoined, and hearing the allegations and proofs of the parties and determining the facts, may upon the merits dismiss such application or enjoin the commissioner from further proceedings and direct him to surrender such business, property and assets to such association." No injunction was applied for or obtained by Intermountain.

Section 13.13 of the Act (Stats. 1931, p. 540), [11] both in its original form and as amended by Stats. 1935, p. 1507, [12] provided: "Upon taking possession of the business, property and assets of any association, the commissioner may under his hand and official seal appoint a custodian, require from him a good and sufficient bond and place him in charge as his representative. Upon taking such possession, the commissioner shall have authority to col-

---

[5] The Gallegos suit was commenced on April 18, 1933, but receivership was not applied for therein until April 4, 1934. McCluskey was appointed receiver on April 20, 1934. Mauk was appointed co-receiver on February 8, 1936.

[6] Commissioner Drapeau succeeded Commissioner Richardson on July 19, 1934.

[7] In effect when the Commissioner took possession of Intermountain's California property, March 29, 1934, and when the Brashear suit was commenced, February 27, 1936.

[8] Here, and throughout this opinion, In-termountain's property, business and assets are referred to as its "property."

possession of Intermountain's California property and when the Brashear suit was commenced.

[9] In effect when the Commissioner took

[10] Intermountain's principal office in California was located in Los Angeles County.

[11] In effect when the Commissioner took possession of Intermountain's California property.

[12] In effect when the Brashear suit was commenced.

lect all moneys due to such association and to give full receipt therefor, and to do such other acts as are necessary or expedient to collect, conserve or protect its business, property and assets. Unless the commissioner shall be enjoined from further proceedings and directed to surrender such business, property and assets or unless such association shall with the consent of the commissioner resume business, then the commissioner shall proceed to liquidate the affairs of such association as hereinafter provided. Whenever the commissioner shall be in possession of the business, property and assets of any association, and regardless of whether or not he shall be liquidating the affairs of such association, the commissioner may in his discretion (1) apply to the superior court of the county in which the principal office in this State of such association is located for an order confirming any action theretofore taken by the commissioner, or authorizing the commissioner to do any act or to execute any instrument not expressly authorized by this act, which order shall be given and made after a hearing on such notice as the court shall prescribe; (2) pay and discharge any secured claims[13] against such association, whether or not such claims shall theretofore have been presented for payment or have become barred from presentation by the expiration of the time limit hereinafter specified; provided that no such claim shall be paid in an amount larger than the then value of the security therefor * * *."

Section 13.16 of the Act (Stats.1931, p. 541), as amended by Stats. 1933, p. 2719,[14] and as amended by Stats.1935, p. 1500,[15] provided:

"In liquidating the affairs of an association, the commissioner shall have power to collect all moneys due to, and claims of, such association and to give full receipt therefor; to release or reconvey all real or personal property pledged, hypothecated or transferred in trust as security for loans; to approve and pay all just and equitable claims * * * to commence and prosecute all actions and proceedings necessary to enforce liquidation; and on the order of the superior court of the county in which the principal office in this State of such association is located, given and made after a hearing on such notice as the court shall prescribe, to compound bad or doubtful debts or claims.[16] * * * For the purpose of executing and performing any of the powers and duties hereby conferred upon him, the commissioner may in the name of such association or in his own name prosecute and defend any and all suits and other legal proceedings and may in the name of such association or in his own name as commissioner execute, acknowledge and deliver any and all deeds, assignments, releases, requests for reconveyance, and other instruments necessary and proper to effectuate any sale of real or personal property or other transaction in connection with the liquidation of such association; and any deed, assignment, release, request for reconveyance or other instrument executed pursuant to the authority hereby given shall be valid and effectual for all purposes as though the same had been executed by the officers of such association by authority of its board of directors. * * *

"Upon determining to liquidate an association, the commissioner shall cause an inventory of all the assets of such association to be made in duplicate, the original to be filed with the court and the duplicate in the office of the commissioner. He shall cause notice to be given by publication once a week for four successive weeks in some newspaper of general circulation published at or near the principal place of business in this State of such association, to all persons having claims against it as creditors or investors or otherwise, to present and file the same and make legal proof thereof at a place and within a time to be designated in such publication[17] * * *

---

13 Brashear and the Griggs claimed to be secured creditors of Intermountain.

14 In effect when the Commissioner took possession of Intermountain's California property.

15 In effect when the Brashear suit was commenced.

16 As amended by Stats.1933, p. 2719, § 13.16 empowered the Commissioner, on the order of the superior court, "to compound bad or doubtful debts or claims and to sell, convey and transfer real and personal property." As amended by Stats.1935, p. 1500, it empowered the Commissioner, on the order of the superior court, "to compound bad or doubtful debts or claims, or to borrow money, or to sell, convey or transfer real or personal property."

17 As amended by Stats.1933, p. 2719, § 13.16 provided that the time to be designated in such publication should be not less than two months. As amended by Stats.1935, p. 1500, it provided that the time should be not less than six months.

and within ten days after such first publication he shall cause a copy of such notice to be mailed to all persons whose names appear of record upon its books as creditors or investors; and upon the expiration of the time fixed for the presentation of claims, the commissioner shall prepare or cause to be prepared in duplicate a full and complete schedule of all claims presented, specifying by classes those that have been approved and those that have been disapproved and shall file the original with the court and the duplicate in the office of the commissioner. Not later than five days after the time of filing such schedule with the court, written notice shall be mailed to all claimants whose claims have been rejected. Action to enforce the payment of or to establish any rejected claim must be brought and service had within four months from and after the date of filing of the schedule of claims with the proper court; otherwise all such actions shall be forever barred. [18] * * *

"The commissioner may under his hand and official seal appoint one or more special deputies to assist in the duties of liquidation and distribution under his direction and may also employ such special legal counsel, accountants and assistants as may be needful and requisite and fix the salaries and compensation to be allowed and paid to each. All such salaries and compensation with such other reasonable and necessary expenses as may be incurred in the liquidation shall be paid by the commissioner from the funds of such association in his hands. * * * From the net realization of assets in excess of such salaries, compensation and expenses, the commissioner shall first pay [approved claims other than those of shareholders and stockholders]; [19] and thereafter he shall distribute and pay dividends in liquidation first to the shareholders until their claims are fully paid or such assets or funds are exhausted, and second, if any such assets or funds remain, to the stockholders until such assets or funds are exhausted. * * * Such distributions shall be made as funds are available therefor to the extent of ten per cent or more of the approved claims of the class of claimants then entitled to distribution, and shall continue until all the assets have been realized upon and a final dividend in liquidation shall be declared and paid. * * * Upon the payment of a final dividend in liquidation, the commissioner shall prepare and file with the court a full and final statement of the liquidation, including a summary of the receipts and disbursements, and a duplicate thereof shall be filed in the office of the commissioner and after due hearing and approval by the court, the liquidation shall be deemed to be closed.

"The determination by the commissioner to liquidate any association, evidenced by filing written notice of such determination with the court, shall operate to stay or dissolve any or all actions or attachments instituted or levied within thirty days next preceding the taking of possession of such association by the commissioner, and pending the process of liquidation as herein provided no attachment or execution shall be levied or lien created upon any of the property of such association.

"Whenever in the case of any association which shall have issued stock, the commissioner shall have fully liquidated all claims other than claims of stockholders, and shall have made due provision for any and all known but unclaimed liabilities, excepting claims of stockholders, and shall have paid all expenses of liquidation, then upon the written request of the holders of a majority of the stock of such association any surplus that may then remain in his hands, together with all the records and effects, shall be delivered to the association or its trustees, and thereafter such association or its trustees shall have title thereto free from any claim of the commissioner."

Pursuant to §§ 13.13 and 13.16, supra, the Commissioner determined to liquidate Intermountain's affairs in California, filed notice of such determination with the superior court of Los Angeles County on

---

[18] As amended by Stats.1933, p. 2719, § 13.16 provided "that the claim of any investor, appearing upon the books of the association to be a valid claim, presented after the expiration of the time fixed in said notice, shall be entitled to share in any dividends declared subsequent to the presentation of such claim." As amended by Stats.1935, p. 1500, it provided: "Any investor, without presenting a claim, shall be entitled, as to any dividends hereafter declared, to share in such dividends to the extent, and in the proper relative order of priority, of any claim shown by the books of the association to exist in his favor against the association."

[19] Brashear and the Griggs did not claim to be shareholders or stockholders.

May 7, 1934, made an inventory of Intermountain's California property, filed it with the superior court on July 19, 1934, and caused notice to be given, by publication and mailing, to all persons having claims against Intermountain, requiring all such persons to present and file their claims, with legal proof thereof, on or before December 31, 1934.

■ Upon the expiration of the time so fixed, it was the duty of the Commissioner to prepare or cause to be prepared, in duplicate, a schedule of all claims presented, specifying by classes those which had been approved and those which had been disapproved, and to file the original with the superior court and the duplicate in the Commissioner's office. Section 13.16, supra. This had not been done when the Brashear suit was commenced, presumably because preparation of the schedule had not been completed. Whatever the cause, appellants have not complained and are in no position to complain of the delay.

■ No schedule of claims having been filed, the time for bringing actions upon rejected claims had not commenced to run, nor had the Commissioner paid any claims, distributed any dividends or proceeded further with the liquidation of Intermountain's affairs when the Brashear suit was commenced. Such payments, distributions and further proceedings were prohibited by a restraining order issued in the Brashear suit on February 27, 1936.

■ By §§ 13.13 and 13.16, supra, elaborate provision was made for administering the property and liquidating the affairs of building and loan associations through the action of a State officer—the California Building and Loan Commissioner —in substantially the same manner as in receivership proceedings in the Federal courts and with results not substantially different from those attained in such proceedings. The statutory procedure was adequate and, in the case of Intermountain, had been honestly and diligently followed. There was no reason to believe that it would not be so followed. In these circumstances, the District Court for Southern California properly refused to appoint receivers or otherwise interfere with the Commissioner's administration. Pennsylvania v. Williams, 294 U.S. 176, 182-186, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166; Gordon v. Ominsky, 294 U.S.

186, 188, 55 S.Ct. 391, 79 L.Ed. 848; Penn General Casualty Co. v. Pennsylvania, 294 U.S. 189, 194-199, 55 S.Ct. 386, 79 L.Ed. 850; Gordon v. Washington, Gordon v. O'Brien, 295 U.S. 30, 36-40, 55 S.Ct. 584, 79 L.Ed. 1282; United States v. Bank of New York & Trust Co., 296 U.S. 463, 475-479, 56 S.Ct. 343, 80 L.Ed. 331; Burton v. Carey, 9 Cir., 82 F.2d 657, 660.

In the Brashear suit, the bill of complaint alleged that Commissioner Drapeau was an unfit and improper person to liquidate Intermountain's affairs. The allegation was denied and not proved. There was neither allegation nor proof that Commissioner Craemer was an unfit or improper person to liquidate Intermountain's affairs.

■ Appointment of a receiver or receivers of Intermountain's California property was not warranted, much less required, by the fact that the District Court for Arizona had appointed a receiver for Intermountain's Arizona property, nor by the fact that the order appointing such receiver had been affirmed, Intermountain Building & Loan Ass'n v. Gallegos, 9 Cir., 78 F.2d 972, nor by the fact that certiorari to review such affirmance had been denied, Id., 296 U.S. 639, 56 S.Ct. 172, 80 L.Ed. 454. For such appointment by the District Court for Arizona had and could have no extraterritorial effect. Great Western Mining & Mfg. Co. v. Harris, 198 U.S. 561, 574-578, 25 S.Ct. 770, 49 L.Ed. 1163. Lion Bonding & Surety Co. v. Karatz, 262 U.S. 77, 79-85, 43 S.Ct. 480, 67 L.Ed. 871.

■ The Building and Loan Commissioner and the State Treasurer of California—defendants in the Brashear suit— were not parties to the Gallegos suit. True, the Gallegos suit was or purported to be a class suit on behalf of named plaintiffs and others similarly situated. But, obviously, the situation of the Building and Loan Commissioner and the State Treasurer of California and the situation of the named plaintiffs in the Gallegos suit were not similar. Hence, the Commissioner and the Treasurer were not concluded or in any wise affected by any order or decree in the Gallegos suit or by anything done or said in that suit.

■ In August, 1937—long after the Commissioner had taken possession of Intermountain's California property and had

commenced liquidation of its affairs in California—Intermountain, by its attorney in fact, Stanley A. Jerman, executed and caused to be recorded in California instruments purporting to transfer and convey Intermountain's California property to the receiver (Harry W. Hill) appointed by the District Court for Arizona. As against the Commissioner and the Treasurer, these instruments were nullities, having no more effect than so much blank paper.

Intermountain's California property consisted, in part, of securities deposited by Intermountain with the State Treasurer pursuant to § 12.04 of the Building and Loan Association Act (Stats.1931, p. 531)[20] as a guarantee fund for the protection and indemnity of California residents who might invest in Intermountain's shares, stock or investment certificates, or with whom it might do business. In the Brashear suit, the bill of complaint alleged that § 12.04 was unconstitutional and void; that Intermountain was insolvent, and known to be insolvent, when the deposits were made; that Intermountain did not, then or thereafter, hold first mortgages on improved real estate in an amount in excess of its liabilities to Brashear, the Griggs and other similarly situated; that the securities were purchased by Intermountain with funds which it held in trust for Brashear, the Griggs and such other persons; and that Brashear, the Griggs and such other persons had liens on the securities and were entitled to have their claims paid from the proceeds thereof, in preference to the claims of other creditors.

These matters, if true, should have been urged in the liquidation proceeding. They were not grounds for the appointment of a receiver. Having concluded, and properly so, that no receiver should be appointed, the court had no occasion to determine the truth or falsity of these allegations. The court's findings of fact numbered I, II and III and its conclusion of law No. 1, whereby it purportedly made such determination, were unnecessary and, for that reason, improper. As to whether or not they were otherwise erroneous, we express no opinion. The decree is modified so as to vacate and set aside said findings of fact numbered I, II and III and said conclusion of law No. 1, without prejudice.

As thus modified, the decree is affirmed.

[20] Section 12.04 of the Building and Loan Association Act (Stats.1931, p. 531) superseded § 646 of the Civil Code, as amended (Stats.1929, p. 182), and was itself amended by Stats.1935, p. 1505.