PHILADELPHIA CREAMERY SUPPLY CO., Limited, et al. v. DAVIS & RANKIN BLDG. & MANUF"G CO. et al.

(Circuit Court, N. D. Illinois.  July 11, 1896.)

1. PATENTS FOR INVENTIONS—AGREEMENT BY LICENSEE NOT TO QUESTION PATENT—PUBLIC POLICY.

A stipulation in a license patent that the licensees will not in any way, directly or indirectly, question the validity of the patent is not void as against public policy.

2. SAME—ESTOPPEL—CORPORATION.

Such stipulation will estop a corporation, formed and controlled by the licensees, from asserting the invalidity of the patent in a suit for infringement.

Suit by the Philadelphia Creamery Supply Company and others against the Davis & Rankin Building & Manufacturing Company and others to restrain the alleged infringement of a patent.

Banning & Banning and C. H. Aldrich, for complainants.

Pierce & Fisher, for defendants.

GROSSCUP, District Judge.  The bill is to restrain defendants from infringement of letters patent No. 239,659, issued April 5, 1881, to Theodore Bergner, assignee of Edwin J. Houston and Elihu Thomson.  The invention relates to the continuous separation of the lighter from the heavier constituents of liquids, and especially to the continuous separation of cream from milk.  This process is accomplished by the combination of a rotating separating vessel, having a solid or imperforate periphery and an upper and lower discharge opening (in which vessel the separation of the liquid is effected), with an inclosing case which receives, after the operation of separation, the lighter ingredients or constituents, the lighter and the heavier ingredients being separately and continuously delivered to suitable receptacles.  The operation of the improvements is specifically described as follows:

"In the operation of our improvements the liquid to be treated is fed to the separating vessel, A, in a continuous stream, graduated in quantity, as required, through the supply tube, B¹, and is received upon the deflecting plate, A², the interposition of which prevents its passage directly to the opening of the lower tubular shaft. Under the influence of the centrifugal force developed by the rapid rotation of the vessel, A, the denser ingredients or constituents of the supplied liquid accumulate at and towards the greatest diameter of the vessel, A, ·as shown by the heavy dots in the drawings, while the lighter ingredients or constituents, arranging themselves nearer the axis of rotation, as shown by the light dots, are discharged around the mouth, a, of the vessel, into the case, B, from which they are withdrawn into a suitable receptacle through the discharge-tube, b⁴, or through the tubular shaft, B², according as a fixed or a rotating case is employed. The denser ingredients or constituents pass under the deflecting plate, A², into the tubular shaft, A¹, from which they are removed from time to time, as required, by a pump. We thus provide a separator having a single source of supply and two distinct discharges, and susceptible of continuous operation without interference of the supplied liquid with the separated products. The supplemental deflecting plate, B³, serves to effectually separate the incoming liquid from the separated lighter ingredients passing upward to be discharged over the mouth of the vessel. It will be obvious that in the operation of our invention stoppages of the apparatus for the insertion and removal of material, as in ordinary centrifugal machines, are unnecessary, and the operation of separation may be continuously carried on until any desired quantity of liquid has been treated. Our improvements are further applicable to many instances in which decantation, filtering, or straining has hitherto been the only practicable mode of treatment,—as, for example, in clay elutriation, the clarifying of liquids, such as wines, beer, varnishes, or oil, the separation of semisolid fats from oil, etc.; and are particularly adaptable to cases in which, from the nature of the materials dealt with, centrifugal machines of the ordinary type cannot be employed,—for example, in the separation of two mingled liquids of different densities one from the other, as in creaming milk."

The figures to which the references above are made are as follows:

FIG. I.     FIG. 2.

FIG. 3.     FIG. 4.

The complainants rely upon claims 5, 6, 7, and 8 of the patent, which are as follows:

"5. The process of creaming milk mechanically, skimming off the cream mechanically, and removing the skimmed milk mechanically by centrifugal force.

"6. The process of creaming milk mechanically, skimming off the cream mechanically, and augmenting the volume of the charge, so as to remove both the cream and the skimmed milk separately by centrifugal force.

"7. The process of creaming milk mechanically, skimming off the cream mechanically, and supplying fresh milk under a regulated feed, so as to drive off the cream and skimmed milk separately, while maintaining incipient and progressive separations of the supply into accretions of cream and skimmed milk.

"8. The process of creaming milk and skimming off the cream by the action of centrifugal force."

The defendants contest the validity of the patent chiefly upon the grounds (a) that it is not a pioneer invention, and, therefore, must be strictly construed; (b) that as described in the patent it is impracticable for the purposes set forth, no practical or effective machine having ever been made thereunder; (c) that it is only an embodiment of the old philosophy of the balance column; (d) that it is anticipated by the previous art, especially by the French patent Fives Lille; and (e) that defendants' machines are not an infringement.

The presentation of the cause has left me in doubt whether the machines exhibited by the complainant, and acknowledged now to be operative, are completely embodied in the patent under consideration; and in doubt, also, whether the so-called "balance column" is, in fact, the philosophical explanation of complainants' process. I am not satisfied, however, that the French patent would have afforded a direction so complete that a mechanic might, from the information thus derived, have constructed the complainants' machine. Neither am I convinced that anything but careful experimentation would have evolved these machines from the balance-column theory; and experimentation is frequently invention of a high order. I am not in doubt, however, as to the fact of defendants' infringement, if the validity of the complainants' patent be asserted, especially as to the claims relating to the process. I have made these preliminary observations because they are pertinent to the conclusion to which I have come, although that conclusion does not determine the validity of the patent.

The complainants, being the owners of the letters patent under consideration, licensed the defendants, Rankin & Davis, the right of sale of certain machines, built under said patent, for the states of Illinois, Michigan, Wisconsin, Minnesota, Kansas, Nebraska, Iowa, and Missouri, during the year 1890, with the option to the licensees for the year 1891. This agreement of license contained, among other things, the provision that the defendants would not thereafter, in any way, directly or indirectly, question the validity of the Houston-Thomson patent. The question now presented is whether this agreement estops the defendants from contesting the validity of complainants' patent in this suit. The agreement, in its restrictions upon the defendants, is somewhat broader than I have pointed out, relating to other devices besides the Houston-Thomson patent, and would not possibly be enforceable in its broadest requirements; but

that inquiry is immaterial, for there is no attempt to enforce it here, except to the extent of estopping the defendants from denying the validity of the patent under consideration. I know of no case which holds that, within fair limitations, and under circumstances themselves reasonable and just, a party may not effectively bind himself to such an engagement. Pope Manuf'g Co. v. Gormully & Jeffery Manuf'g Co., 144 U. S. 224, 12 Sup. Ct. 632, was not such a case as is here presented. The attempt there was to specifically enforce a contract in itself unreasonable, and tainted with the suspicion that it had not been fairly obtained. The court expressly declines to determine whether a man may or may not contract beforehand not to set up a defense against the validity of a patent. On the other hand, Judge Colt, in Dunham v. Bent, 72 Fed. 60, has affirmatively held that such a contract may operate as an estoppel upon the infringers setting up the defense of invalidity.

The point contended for is that public policy forbids a contract of the character under discussion. With that view, let us see what the exact engagement is. The complainants have obtained from the government the grant of a monopoly of the invention embodied in the letters patent. If these letters patent, in fact, give to the world an invention, the monopoly is right and should be enforced. The letters patent are themselves prima facie evidence of the existence of invention. Their force and effect as such can only be avoided by those who are prepared to prove that the so-called "invention" does not in fact exist. In case of such dispute the courts are empowered to make inquiry and settle the points involved. Now, the complainants and the defendants, by the agreement under consideration, stipulate that, as between them, no such dispute shall arise. The complainants give something, and the defendants get something, as the fruit of this stipulation. It amounts to no more certainly than an agreement upon the part of the defendants that they will not, for the lifetime of the patent, and within the United States, make, use, or sell machines embodying the so-called "invention." What public policy forbids that? Public policy permits reasonable restraints upon trade. Had the defendants, engaged in the manufacture of these machines, sold their stock to the complainants, they might, as a part of the transaction, have prohibited themselves from engaging in a like trade again within reasonable limits, or for a reasonable period. No public policy would have forbidden that, unless the restriction would have been injurious to the party prohibited, or to the general public at large. How will the defendants themselves, if the contract under consideration be enforced, be injured to the extent that they ought to be protected? They acted openly, and received the consideration for their action, and the world in every other field is still open to them. The test of the application of this rule of public policy is: Would the prohibition proposed unconscionably injure the individual, or greatly injure the public? How will the general public be injured? Their right to dispute the validity of the patent, through any infringer who has the courage to engage in the manufacture of these machines, and their right to use these machines thus manufactured, are not affected by this stipulation. They

lose at most the benefits only of competition from one who cannot compete without violating his own word and just obligation.

Nor does this case present an instance where a settled public policy is attempted to be circumvented by a private contract, such as that which relates to the statute of limitations, usury, etc. The settled public policy of the country, on the contrary, is to give to the inventor the fruit of his invention, and, if a given individual agrees to leave the field to him to whom the government has granted the patent, the public has suffered no wrong. A case might be conceived where, by widespread contracts such as these, an invention without merit might, by the buying up of the whole field of manufacturers, exclude competition; but such a conception is the nightmare of conjecture rather than a possibility of reality. If it should ever become a practical menace, some remedy would doubtless be discovered. It has no application to the case at bar at least, and does not persuade me that the defendants should have that which they fairly contracted away.

The proof satisfies me that the Davis & Rankin Building & Manufacturing Company is only a corporate name for Daniel J. Davis and Thomas Rankin. The men behind this corporation, responsible for its doings and recipients of its profits, are Davis and Rankin. They, as individuals, made the contract under consideration, and they cannot, in my opinion, escape its just obligations by metamorphosing themselves into an artificial person. A decree may, therefore, be entered finding that there is reasonable ground for complainants' claim that the Houston-Thomson patent is valid; but the court does not at this time pass upon its validity; that the machines of the defendants, if the patent is valid, are probably infringements; that Davis and Rankin entered into the contract referred to in this opinion; and that the Davis & Rankin Manufacturing Company is, under the circumstances of this case, bound thereunder; that the defendants are thereby estopped from denying the validity of complainants' patents, and restraining defendants from infringing the patent.