## GENERAL ELECTRIC CO. v. SAVE SALES CO. et al.

### No. 6865.

Circuit Court of Appeals, Sixth Circuit.
March 6, 1936.

---

Charles Neave, of New York City (Marshall, Melhorn, Marlar & Martin, of Toledo, Ohio, and Hubert Howson and John H. Anderson, both of New York City, and Crary Davis, of Toledo, Ohio, on the brief), for appellant.

Wilber Owen, of Toledo, Ohio (Charles W. Owen and Owen & Owen, all of Toledo, Ohio, on the brief), for appellees.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The patent for infringement of which appellant as plaintiff sought injunctive relief and damages is Pipkin No. 1,687,510, granted October 16, 1928, for an electric light bulb. The issues were referred to a master, who in an exhaustive report upon the evidence found the patent to be valid in each of its claims, and that the defendants, Save Sales Company and Max Ettinger, had infringed. There being no judge available in the Western Division of the District to pass upon exceptions to the master's report, they were referred to a judge of the Eastern Division, who disposed of the case in a short memorandum holding the patent invalid for lack of patentability over Wood, 1,240,398, and a decree was entered dismissing the bill.

Exigencies in District Court dockets upon occasion justify references of patent cases upon the issues of validity and infringement to a master (Los Angeles Brush Mfg. Corp. v. James, 272 U.S. 701, 707, 47 S.Ct. 286, 71 L.Ed. 481), and consent leaves litigants little cause for complaint, even though references are condemned by the Supreme Court as general practice.

The patent is for an electric light bulb of the type used in incandescent lamps, and is for a bulb with inside frosting. Whether the inventor made a substantial contribution to the industry, and if so it involved the exercise of invention, requires consideration of the state of the art at the time of the patent grant.

For many years incandescent lamps had bulbs of clear glass. Such bulbs were hard on the eyes because of the intense glare produced; their maximum brightness being centered at the filament. It then became common practice to frost the outside surface of the bulbs. While this reduced brightness, it caused diffusion of light over the entire bulb and so substantially decreased glare. Outside frosting, however, produced a rough surface, to which dirt readily adhered, and from which it could not easily be removed. The lamps soon became unsightly and lost much of their brightness. To overcome these disadvantages attempts were made from time to time to subject them to frosting upon their inner surfaces. It was readily seen that if this could satisfactorily be done, the smooth outer surface of the bulb could easily be cleaned, while the frosted inner surface was protected. Earlier attempts at inside frosting were, however, failures, due to the fact that frosting applied to the inside of the bulb weakened it and made it fragile, with substantial increase in breakage in manufacture, shipment, and use. The more common method of frosting was by etching with a chemical compound containing hydrofluoric acid. The effect of the acid was to remove material and to leave upon the surface of the glass minute and sharp angular crevices. These crevices when upon the outside of the bulb did not weaken it, for the reason that when subjected to pressure or blow they were under compression, and there was no tendency for them to open and start cracks. When, however, the crevices were upon the inside of the bulb, external pressure would put them under tension, and they would tend to open, with resulting cracking of the bulb.

What Pipkin claims to have discovered is that by subjecting bulbs frosted in the usual manner on the inside to a further etching treatment he could enormously increase their strength, even though this treatment removed additional material. The effect of the second etching treatment with a weaker acid, at reduced temperature, or for a shorter period of time, was said to round out the sharp crevices so that cracks no longer started therefrom. This is claimed to be an absolutely new attack upon a long-recognized problem, and Pipkin is said to have succeeded where others had failed. By his invention it is asserted a new article was produced; an inside frosted bulb of a strength comparable with that of a clear bulb, although for commercial purposes he was not required to go so far. He conceived it to be enough if the strength of the inside frosted bulb was

brought up to a point where it was over 20 per cent. of the strength of a clear bulb, or equivalent to a strength three times that of the ordinary inside frosted bulb. His preferred lamp, however, was one in which the strength had been brought up to at least 45 per·cent. of that of a clear bulb, or to about seven times the strength of an ordinary inside frosted bulb.

Conceiving that he had invented both a new article and a new method of great utility, Pipkin filed an application for a patent, which, after a more or less stormy journey through the Patent Office, was granted for the article, with monopoly defined by two claims. The first is printed in the margin[1] and covers an inside frosted lamp brought up to a strength of 20 per cent. of the clear bulb. The second is identical except that it covers a lamp in which strength has been brought up to at least 45 per cent. of that of the clear bulb. It is important to note that both of Pipkin's claims cover a product and not a method; such method claims as were originally included in his application having been rejected by the Patent Office.

In their challenge to the validity of the patent on the ground of anticipation and lack of invention over the prior art, the defendants' most pertinent reference is the Wood patent, held to anticipate below. Dr. Wood was granted a patent September 18, 1917, for a method of making light diffusing screens. He was primarily concerned with increasing illumination transmitted by glass surfaces treated to achieve diffusion and avoid glare. He sensed no problem of fragility, and was engaged upon no effort to strengthen frosted glass surfaces. He had observed that an ordinary ground glass screen, while diffusing transmitted light perfectly, transmitted only 60 to 70 per cent. thereof, and that this resulted from the circumstances that the surface of the glass is cut into irregular crevices, pits, and grooves of considerable depth; the pits reflecting the light at a large angle of incidence and either returning it toward the source or scattering it laterally within the glass plate. This unfavorable characteristic he claims to have overcome by treating the surface of the glass by a process which would cover it with minute smooth depressions similar to small concave lenses. An embodiment of his method is to pit the plate by an air blast containing fine emery dust or carborundum. Each grain of dust produces a microscopical dent in the surface, which is then flowed with hydrofluoric acid, enlarging and smooting the pits into concave lenses. It will be noted that Wood's patent was for a method; that its objective was to increase light transmission without impairing light diffusion; that he was concerned with no problem of strengthening glass; and that he started with a blasting and not an etching step.

Perhaps little importance would have been attached to Wood but for the somewhat casual statement in the patent that "Such a screen is also useful for rendering the bulbs of incandescent lamps diffusing without at the same time causing the very marked loss in the efficiency of the lamp, which results from frosting the bulbs in the usual manner." The record is clear, however, that the usual manner of frosting incandescent bulbs at the date of the Wood application was to frost them on the outside, and that in such practice no problem in respect to strengthening the bulbs had been encountered. It is true that there had been some attempts many years before Wood, one by the Marlboro Electric Machine & Lamp Company, to produce inside frosted lamps in a commercial way. They were, however, failures, and had been abandoned long before Wood. There can be no reasonable inference that these efforts were considered by Wood in his reference to the frosting of bulbs in the usual manner.

In 1913 and 1914, Dr. Wood had had some correspondence with the General Electric Company, as the result of which they sent him some lamps to frost by his method; his patent application having been filed May 29, 1913. The lamps were not available at the trial, and Dr. Wood testified wholly from recollection, but it seems quite clear that if Dr. Wood frosted any lamps they were frosted upon the outside and not upon the inside, and there is no evidence of strengthening effect upon the bulbs, either sought, noted, or achieved. Wood's single experiment with inside frost-

---

[1] A glass electric lamp bulb having its interior surface frosted by etching so that the maximum brightness of an ordinary incandescent lamp comprising such a bulb will be less than 25 per cent. of that of said lamp with a clear bulb, said interior bulb surface being characterized by the presence of rounded as distinguished from sharp angular crevices to such an extent that the strength to resist breakage by impact is greater than 20 per cent. of that of the clear bulb.

ing was made with a glass flask by the shaking method rather than by the air blast. He attached no importance to it. "The plate was a very imperfect thing." He did not send the flask to anybody. "It was a private experiment."

The District Court thought that Wood furnished the germ of the Pipkin idea. Even so we fail to see the pertinency of the observation or that it compels the result below. Progress in the arts is marked by the gradual evolution of concepts rather than by unrelated and independent steps. Moreover, the Wood patent is for a process. What we said in Nestle-Le Mur Co. v. Eugene, Ltd., 55 F.(2d) 854, as to the substantial independence of and the radical differences between machine and process patents is, of course, equally true as between process and article patents. Just as an old process may be practiced by a new machine, or a new process by machinery which may be either old or new, just so a new article of commerce may involve the exercise of the inventive faculty even though in producing it a known method is resorted to. Of course there always remains the question as to whether the new article was the result of invention or was inevitably suggested to those skilled in the art by what had gone before. Were the Pipkin lamps impossible without Wood's method, and this we do not hold, yet the problem of commercially strong inside frosted bulbs remained unsolved for many years after Wood's disclosure. Wood contributed nothing to the electric lamp industry, and it was clearly not obvious that the removal of additional material from an already weakened lamp bulb would strengthen it. In this respect the present problem bears a somewhat different aspect than do many others in the field of patents. Generally a problem that is solved seems simple until one has placed himself in the position of those skilled in the art prior to disclosure. Here solution is not obvious even after disclosure, for neither the inventor nor the experts have made it clear by what law of physics a fragile bulb has been strengthened by removing material therefrom. That it has been done is amply demonstrated, and in fact conceded. Wood does not anticipate Pipkin.

Certain prior practices of the Save Electric Corporation at Brooklyn, the Save Miniature Lamp Company at Toledo, and of the Westinghouse Lamp Company, are also relied upon by the defendants. They are not established by the required proofs, and need be given little consideration. The best that can be said for them is that they are based upon the fallible recollection of witnesses after the lapse of many years, and in any event fail to point to strengthening treatment of inside frosted lamps. The double dipping practices referred to below were clearly either cleansing dips or applied only to defective lamps not sufficiently frosted in original treatment. There is no proof that they resulted in the Pipkin lamp or its equivalent.

The claim of estoppel made by the defendants and based upon the Patent Office history of the Pipkin patent, though persuasive below, is somewhat difficult to comprehend. It is true that a number of process claims were rejected in the Patent Office over Wood, but Wood was cited as anticipating all of the claims of the patent. The inventor conceiving himself sufficiently protected in his invention by the claims allowed, thereafter and not until then abandoned others. The appellant, his assignee, seeks to recover no lost ground. The court thought that "the Patent Office history of the Pipkin patent so far impairs its patentability over Wood as to give adequate force to the challenge of validity and to overcome the weight of the presumption of validity of the patent." The very converse of this proposition is the law, for it has long been settled that where references in the record were before the Patent Office and were rejected as anticipations the presumption of novelty and invention which arises from the grant of the patent is greatly strengthened. Gairing Tool Co. v. Eclipse Interchangeable Counterbore Co., 48 F.(2d) 73, 75 (C.C.A.6); Gordon Form Lathe Co. v. Walcott Machine Co., 32 F.(2d) 55 (C.C.A. 6); Hildreth v. Mastoras, 257 U.S. 27, 32, 42 S.Ct. 20, 66 L.Ed. 112. It must be noted that there is here no question of extent or scope of the claims. They are very precisely defined; in fact too precisely defined in the opinion of the court below. The principle that "where an applicant for a patent is compelled by a rejection of his application to narrow his claims, he cannot after the issue of the patent broaden them," as set forth in Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 293, 75 L.Ed. 707, or as it was somewhat differently expressed by us in D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 259 F. 236, 240, cannot be here applied, because the plaintiff seeks no broader interpreta-

tion of its patent claims than their language clearly imports. There was no estoppel.

There is little doubt that the defendants infringed. The master so found, and the court did not deal with the issue. The proofs showed the defendants' bulbs to have a strength of 31 per cent. of similar clear bulbs. Complaint is made that this was arrived at by comparing the strength of the infringing bulbs with the strength of clear bulbs produced by the plaintiff, but the plaintiff had none of the defendants' clear bulbs, and the defendants did not offer to supply them. The inference is clear that their strength would not have substantially differed. Moreover, the defendants repeatedly assert that the plaintiff so dominates the industry that it controls the standards of lamp manufacture. If this is so it supports the inference.

The decree below is set aside. The cause is remanded for the entry of a new decree holding both claims of the patent in suit valid, and granting the usual injunctive relief and accounting.