## STEINER SALES CO. v. SCHWARTZ SALES CO.

### No. 1621.

Circuit Court of Appeals, Tenth Circuit.
May 31, 1938.

Rehearing Denied Sept. 22, 1938.

Ruth v. Climax Molybdenum Co., 10 Cir., 93 F.2d 699, 703; I. T. S. Rubber Co. v.

Essex Rubber Co., 272 U.S. 429, 443, 444, 47 S.Ct. 136, 141, 71 L.Ed. 335.

George I. Haight, of Chicago, Ill. (M. K. Hobbs and Harold Olsen, both of Chicago, Ill., on the brief), for appellant.

F. Allan Minne, of Chicago, Ill. (Milton P. Firestone, of St. Paul, Minn., and Farnsworth, Van Cott, Riter & Farnsworth, of Salt Lake City, Utah, on the brief), for appellee.

Before LEWIS, PHILLIPS, and WILLIAMS, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a suit for a declaratory judgment brought by Schwartz Sales Company[1] against Steiner Sales Company[2] under the provisions of 28 U.S.C.A. § 400.

In its complaint Schwartz challenged the validity of certain patents owned by Steiner and the validity of certain contracts entered into by Steiner with its licensees on the ground that the contracts violate Section 1 of the Sherman Act and Section 3 of the Clayton Act (15 U.S.C.A. §§ 1, 14), alleged that an actual controversy existed between it and Steiner with respect thereto, and prayed for a decree adjudging the patents and contracts invalid and enjoining Steiner from enforcing the contracts and from entering into other similar contracts.

In its answer and counterclaim Steiner asserted the validity of the patents, charged Schwartz with infringement thereof and of one additional patent, and with malicious interference in the contract relations between Steiner and its licensees, and prayed for appropriate relief.

The trial court held the patents in suit were invalid and that since the patents were invalid the license contracts violated Section 3 of the Clayton Act.

THE VALIDITY OF THE PATENTS.

The patents in suit here involved are: No. 1,426,121 for a roller towel cabinet applied for November 15, 1918, and issued to G. A. Steiner, August 15, 1922; reissue No. 17,352 for a roller towel cabinet applied for December 3, 1928, and reissued to G. A. Steiner and Gottfrid Olson, July 2, 1929; and No. 1,959,938 for a roller towel control mechanism, applied for July 10, 1926, and issued to T. B. Tyler, May 22, 1934.

In the arguments and briefs of counsel for Schwartz below it was not denied that the patents in suit if valid are infringed by towel cabinets manufactured and sold by Schwartz. Schwartz in previous litigation had admitted infringement of patent 1,426,121 and reissue 17,352, if valid. Hence, our inquiry here is with respect to the validity of the claims in suit.

The patents all relate to continuous towel dispensing cabinets in which generally as a length of clean toweling is withdrawn from a roll in the cabinet a corresponding length of soiled toweling is taken up into the cabinet and rolled up on a take-up roll within the cabinet.

Since an early day a large part of the linen supply business has consisted of the furnishing of towels. Ordinary roller towels were first furnished. Because the ordinary roller towel came to be regarded as a menace to public health, it became necessary to devise a cabinet or other means through which clean portions of toweling could be dispensed and the soiled toweling taken up in such a way as to prevent contamination of the clean portions by the soiled toweling and by previous users of the toweling. In an effort to solve the problem various means were tried out. Examples are: A book of towels held together by a clamp; individual grommet towels or towels with an eyelet threaded on a chain or ring; and rolls of loose and continuous toweling mounted on a roller so that each user could withdraw a length of clean toweling but without any means to wind up the soiled portion of the toweling and keep it from contacting the clean portion. It is obvious that none of these solved the problem.

G. A. Steiner has been in the linen supply business since 1887. He was confronted with the problem of providing a satisfactory substitute for the roller towel. It had to be one that would dispense the clean toweling in a sanitary condition; the roller towel was cheap and hence it was desirable that the substitute should be inexpensive; it was necessary to make the reloading device simple because it had to be

---

[1] Hereinafter called Schwartz.　　[2] Hereinafter called Steiner.

reloaded with clean toweling by janitors and other persons not mechanically skillful; and it was essential that the device be constructed in such a way as to avoid the temptation of the general public to tamper with it and get the mechanism out of order. Prior to November 15, 1918, G. A. Steiner conceived the roller towel cabinet covered by patent 1,426,121. Figure 3 of the patent drawings follows:

FIG. 3

There is supported in the lower part of the cabinet a clean towel roll 8 and in the upper part of the cabinet a soiled towel take-up roll 25. Each has a corresponding feed roll. They are numbered 12 and 13, respectively. Each roll is mounted on a rotatable shaft journaled in a frame. Roll 12 rests by gravity on roll 8 and roll 25 rests by gravity on roll 13. The feed rolls are provided with sprockets and chains so that any surface movement of the feed roll 12 produces a corresponding movement of the feed roll 13. As a length of clean toweling is withdrawn from roll 8 it travels between that roll and roll 12 and by frictional effect on roll 12 causes it to revolve. Roll 12 drives roll 13. Roll 13 by frictional effect on the toweling on roll 25 causes it to revolve. As a result a length of toweling equal to that withdrawn from roll 8 is taken up on roll 25. The clean toweling depends from the cabinet through its bottom near the front of the cabinet and the used toweling reenters the bottom of the cabinet at the rear thereof. Guide means in the form of rods 27 are provided at the back of the cabinet to keep the soiled portion of the toweling separated from the clean. The soiled portion travels a considerable distance within the cabinet before it reaches the take-up roll. This permits it to dry and straighten out, so that wrinkles are removed before it reaches the take-up roll and insures it being rolled up evenly on the take-up roll.

The claims in suit are numbers 17, 18, 19, and 20. Claim 18 is typical thereof and reads as follows:

"A towel cabinet comprising a casing, a clean towel roll in the lower part of said casing from which a loop of clean towel depends, within reach of the user, a soiled towel roll in the upper part of said casing to which the soiled towel is guided between said clean roll and the rear of said casing, feeding means acted on by one roll and a feeding means for the other roll, said feeding means being inter-geared to cause the same amount of surface movement of the rolls, whereby the pull of the user on the clean towel to unwind it from its roll will impart a similar movement to the soiled roll to wind the towel thereon."

Two patents are relied upon as anticipations.

One, Hendrick, No. 1,050,539, was a file wrapper reference. The presumption of validity that flows from the granting of the patent is enhanced by the fact that the patent in suit was granted after consideration by the Patent Office of the patent relied upon by Schwartz as an anticipation.[3]

[3] Linville v. Milberger, D.C.Kan., 29 F.2d 610;

J. A. Mohr & Son v. Alliance Securities Co., 9 Cir., 14 F.2d 799, 800;

In Hendrick the clean toweling leaves the cabinet and the soiled toweling reenters the cabinet through recesses in the front side or face of the cabinet only slightly separated. Hence, there is no separation of the clean toweling and soiled toweling to prevent contamination as in the patent in suit.

In Hendrick the soiled toweling does not travel a substantial distance in the cabinet before reaching the take-up roll and no means are provided to dry and straighten out the soiled toweling and eliminate wrinkles therefrom before it reaches the take-up roll as in the patent in suit.

In Hendrick the toweling travels between the take-up roll and its corresponding feed roll. The latter pushes the loose toweling on to the take-up roll and a loose and uneven take up is likely to result. Whereas, in the patent in suit the feed roll for the take-up roll contacts only the toweling rolled up on the take-up roll and pulls the loose toweling over and on to the take-up roll thereby insuring a tight and even take up of the toweling.

The German patent, No. 224,544, is also relied upon as an anticipation. It was published in Germany on July 22, 1910. This patent discloses an arrangement whereby the clean toweling is withdrawn from the cabinet and the soiled toweling reenters the cabinet through recesses that are farther apart than in Hendrick. However, its arrangement of the rolls and operative principles are entirely different from the patent in suit. The clean towel roll and soiled towel roll are placed in close proximity within the cabinet. The use of intergearing between the two feed rolls is not disclosed. The soiled towel roll is operated by means of a spring instead of by intergearing. If the spring be strong enough to take up the toweling it will constantly hold the loop of the toweling against the bottom of the cabinet. If it be not suffi-

ciently strong it will not draw the soiled toweling up into the cabinet. Hence, the device is probably inoperative.

A foreign patent is to be measured as anticipatory not by what might have been made out of it, but by what is clearly and definitely disclosed by it.[4]

The Hendrick patent was granted in January, 1913. On November 22, 1919, Orcutt filed an application for a patent on a continuous towel cabinet which issued as patent No. 1,353,416, on September 21, 1920. On February 15, 1917, Bowman applied for a patent on a continuous towel cabinet which issued as patent No. 1,386,-761, on August 9, 1921. In both, the clean toweling leaves and the soiled toweling reenters the cabinet through openings in the face of the cabinet which as in Hendrick are only a slight distance apart. Thus, it will be seen that others skilled and working in the art at the same time as G. A. Steiner failed to conceive the means adopted by him to protect the clean from the soiled toweling. The fact that others skilled in the art in quest for a solution of the problem failed and that G. A. Steiner first conceived the combination of elements, arrangement and mode of operation embodied in the patent in suit is persuasive evidence that he exercised inventive genius and not mere mechanical skill.[5]

Schwartz entered the continuous towel cabinet business in 1931. The Hendrick patent had then expired. Notwithstanding Schwartz was free to use the combination and construction disclosed by Hendrick it chose to copy the G. A. Steiner device. This in itself is evidence of invention.[6]

While the G. A. Steiner device, viewed retrospectively, seems to be simple, it is significant that he was the first to conceive of a simple, inexpensive, and practical continuous towel cabinet that would overcome the objectionable unsatisfactory features of

Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 71 F.2d 539, 560;

Gairing Tool Co. v. Eclipse Interchangeable Counterbore Co., 6 Cir., 48 F.2d 73, 75;

General Electric Co. v. Save Sales Co., 6 Cir., 82 F.2d 100;

Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 919;

Artcraft Silk Hosiery Mills v. Gotham Silk Hosiery Co., 3 Cir., 72 F.2d 47;

Hildreth v. Mastoras, 257 U.S. 27, 32, 42 S.Ct. 20, 22, 66 L.Ed. 112.

4 Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463;

Donner v. Sheer Pharmacal Corporation, 8 Cir., 64 F.2d 217, 220;

Nordberg Mfg. Co. v. Woolery Machine Co., 7 Cir., 79 F.2d 685, 687.

5 Stearns-Roger Mfg. Co. v. Ruth, 10 Cir., 62 F.2d 442;

Hughes Tool Co. v. International Supply Co., 10 Cir., 47 F.2d 490, 492.

6 Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277;

Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 919;

Trico Products Co. v. Apco-Mossberg Corporation, 1 Cir., 45 F.2d 594, 598.

the ordinary roller towel and otherwise solve the problem.

Hence, we conclude that patent 1,-426,121, is not void for anticipation, that it discloses a novel and useful cabinet and mechanism for dispensing continuous toweling, and that the conception thereof arises to the dignity of inventive genius.

In a continuous towel cabinet it is necessary for the attendant from time to time to remove the soiled towel roll and insert therein a clean towel roll and to thread the open end of the clean towel roll over the various succeeding rolls in the path the toweling is to travel and to attach it to the take-up roll. The object of the invention covered by reissue patent 17,352 is to provide a device in which the reloading and threading of the toweling can be more readily accomplished by the attendant. Since the attendants are not persons skilled in mechanics it is necessary that the reloading device be comparatively simple and easy of operation.

Figures 2 and 3 of the patent drawings follow:

FIG.2

FIG.3

The cabinet comprises an outer section having side walls 2, a top wall 3, and a rear wall 4. Within this outer section is an inner section comprising a trough-like member 5, having side walls 7 and a rear wall 8 pivoted at 9 so as to swing forward in the manner illustrated in Figure 2. This enables the attendant to reach into the cabinet, grasp the loose end of the toweling, carry it upwardly over the various rollers and fasten it on to the take-up roll, and then restore the pivoted section to its normal operating position.

It will be further observed that the clean towel roll 6 is positioned at the bottom of the inner section and that the feed roll 14 is positioned substantially above it and swings forward with the pivoted section, leaving a clear space for the attendant to reach into the cabinet and grasp the free end of the toweling.

The claim in suit reads as follows:

"A towel cabinet adapted to receive a supply of clean towel and comprising outer and inner sections, delivery and take up feed rolls having a driving connection between them for simultaneous movement and mounted in said cabinet, a take up roll for the soiled towel supported to contact with said take up feed roll, the inner and outer sections being located to provide a gap between the inner section and the rear wall of the outer section through which the web of soiled towel may be stretched to said take up roll, the rear of said inner section having a closure for separating the clean portion of the towel from the soiled portion thereof, said closure having means to permit its forward movement to temporarily enlarge said gap and allow insertion of the hand in stretching the web to said take up roll, and a tension device in said cabinet adjacent said take up feed roll and engaging the towel web."

The only patent which can seriously be urged as an anticipation is Steiner No. 1,564,292. In that patent the feed roll is positioned at the bottom of the cabinet and the clean towel roll above it. Back of them is a partition member which extends upwardly from the floor of the cabinet and behind which the soiled toweling travels upward to the take-up roll. This partition member has a hinge joint a short distance from the floor of the cabinet permitting its upper portion to be swung toward the front of the cabinet.

Neither the clean towel roll nor the feed roll move forward with the hinged section. The position of the clean towel roll greatly limits the forward movement of the hinged section and does not leave ample clear space for the attendant to reach in and grasp the free end of the toweling. In patent 1,564,292, Steiner was endeavoring to solve the problem, but he failed to do so effectively because of the location of the clean towel roll and its corresponding feed roll. By placing the clean towel roll at the bottom of the cabinet and so arranging the mechanism that its corresponding feed roll could swing forward with the pivoted section and be restored to normal operating position after the toweling had been inserted Steiner effectively solved the problem in the reissue patent. While the prior patent to some extent pointed the way, it did not solve the problem, and we do not think it can be regarded as an anticipation.

This device of the reissue patent embraces the principles disclosed by G. A. Steiner in his original cabinet and combines with the elements of that cabinet reloading means which are simple of operation, practical and effective. We conclude that it is a marked improvement over anything disclosed in the prior art and that its conception constitutes patentable invention.

The fact that the Steiner cabinets have enjoyed marked commercial success and that Schwartz has endeavored to share therein by appropriating the teachings of patents 1,426,121 and reissue 17,352 lends strong support to our conclusion that the conception of these devices constitutes patentable invention.[7]

Counsel for Schwartz urge that Steiner has made such changes in its commercial devices that it cannot be said that patents 1,426,121 and reissue 17,352 have enjoyed commercial success. We do not think this contention is well founded. It is true that the commercial devices disclosed many improvements, but the general principles first conceived by G. A. Steiner and disclosed in his original patent are still employed by Steiner and have been appropriated by Schwartz.

The claim in suit of patent 1,959,938 covers a pinch roll to maintain the tension of the toweling on the feed roll over which the toweling travels as it leaves the clean towel roll. The claim reads:

[7] Salt's Textile Mfg. Co. v. Tingue Mfg. Co., D.C.Conn., 227 F. 115, 117; Railroad Supply Co. v. Hart Steel Co., 7 Cir., 222 F. 261, 268.

"A towel delivery mechanism comprising a casing having a support therein adapted to receive a supply of clean towel, a feed roll in said casing above said support and the towel supply and adjacent the front of said casing in position for its surface to contact with a towel web which may be stretched upwardly from said supply, a pinch roll and means supporting it near said feed roll, the relative position of said feed roll and pinch roll being such that a web of towel may be stretched only from under said feed roll and over said pinch roll to depend at the front of the cabinet in position for use, said supporting means being adapted to direct said pinch roll toward said feed roll when a user of the towel applies a downward pull thereto whereby the web of towel will be pressed against the surface of said feed roll and slippage thereon prevented."

In this device the clean toweling travels from the clean towel roll over a portion of the surface of its corresponding feed roll and thence upwardly over a pinch roll and then proceeds directly downward and out through the bottom of the cabinet at the front thereof. This feed roll is intergeared with the other feed roll which operates the take-up roll. The function of the pinch roll which is movably or pivotally mounted is to increase the friction of the toweling on the clean towel feed roll as the toweling is pulled from the cabinet. The greater the downward pull on the toweling the greater is the pressure exerted by the pinch roll upon the clean toweling traveling over the feed roll.

Thus, by preventing the toweling from slipping on the clean towel feed roll by the pressure of the pinch roll the amount of toweling on the take-up roll and the amount of clean toweling unwound from the clean roll is maintained in balance.

The prior patent of Hails discloses a pinch roll movable in a slot so arranged with the clean towel feed roll that when the toweling is pulled downward from the cabinet the pinch roll will move in a slot and contact with the feed roll and increase the friction of the toweling on the feed roll. It is true that in Hails' device the arrangement is such that the direction of the pull on the toweling is slightly forward instead of directly downward so that the pull on the toweling will not cause a movement of the pinch roll and an increase of tension on the feed roll to the same degree as in the patent in suit. It seems to us, however, that the rearrangement would be obvious to an ordinary mechanic skilled in the art and that the patent in suit does not constitute patentable invention over the disclosure of Hails. We conclude accordingly that this patent is void for anticipation.

## THE VALIDITY OF THE CONTRACTS.

The pertinent parts of the form of contract used by Steiner for its license agreements are set out in Note 8.

We have observed that G. A. Steiner invented the towel cabinet covered by his original patent 1,426,121 to meet an urgent

---

8 "This Contract, dated ...... 19.. between Steiner Sales Company, a Utah corporation, Licensor and .......... of .......... State of .........., Licensee.

Witnesseth:

"1. Licensor owns U. S. Letters Patents Numbers

[Here are set out the numbers of a great many patents.]

and holds pending patents applications for other towel cabinet inventions, and also contemplates future improvements.

"2. Licensee desires for its own use said inventions and all improvements during the term of all of Licensor's present and future patents.

"3. Licensor hereby grants Licensee the right to use said towel inventions, including any improvements thereon, for the term of any and all present and future patents; restricted, however, to Licensee's own business and own use in the following cities and adjoining suburbs:

"4. This license is expressly subject to the following covenants and conditions:

"(a) Licensee expressly agrees not to contest, directly or indirectly, the validity of any patents upon towel cabinets or improvements thereon, whether now existing or hereafter obtained by Licensor, the inventions of which patents are embodied in towel cabinets now or hereafter sold, loaned or leased to the Licensee. The provisions of this paragraph shall be binding upon the Licensee even after the suspension or termination of this agreement. ......

"(d) Licensee shall purchase said patented cabinets and improvements solely and exclusively from a manufacturer authorized by the Licensor.......

"6. Default or failure to pay the royalty at the time specified herein, or default in or failure to perform any of the conditions hereof, shall automatically suspend all rights of the Licensee under this license until (if at all) reinstated by the Licensor. Upon such default the

demand in his own business. He originally did not intend to sell these cabinets. But due to insistence of other linen supply companies and laundries who were likewise confronted with the need of something to replace the ordinary roller towel he eventually consented to license and sell to others.

Continuous towel cabinets are now manufactured by Steiner, Schwartz, Pull-Clean Company, Burroughs Company, the Darman Company, and the Simplex Company. They are sold or leased to linen supply companies and laundries. There are about 1300 linen supply companies and about 4600 power laundries, who are users or prospective users of continuous towel cabinets. Steiner has license agreements with 675 linen supply companies and laundries. The cabinets are installed in public washrooms and it is the business of the linen supply companies and laundries to insert a new roll of clean toweling in the cabinets when the old roll is exhausted.

Up to January 1, 1937, Steiner had sold more than 152,000 of its continuous towel cabinets.

Schwartz entered the field in 1931. Steiner was then manufacturing and selling cabinets which employed the principles of G. A. Steiner's original invention with many improvements. Up to 1931, Steiner had expended nearly $400,000 in improving and selling its continuous towel cabinets and had sold more than 100,000 of them. From 1931 to 1936, Steiner expended over $200,000 in improving its continuous towel cabinets and promoting the use thereof.

The uncontradicted testimony of many users established that the Steiner cabinets are superior to all other makes and that they are better constructed and give more satisfactory service than the Schwartz cabinets.

The improvements developed by Steiner are manufactured so that their parts are interchangeable in the old cabinets. This enables the licensees constantly to modernize their old cabinets by equipping them with the improvements as they are developed.

One of the important improvements in the Steiner cabinet is a time control mechanism which, after a length of clean toweling has been withdrawn, prevents a second length from being withdrawn until after the lapse of a predetermined time interval. This improvement is covered by the Martin patent No. 1,479,864, owned by Steiner. Schwartz does not employ a time control mechanism in its cabinets.

Since 1931 Steiner has sold 51,000 cabinets and Schwartz 6,600. 10,000 of the Steiner cabinets were sold to the American Linen Companies, owned by the Steiner family which also owns Steiner. Of the remaining cabinets sold by Steiner, 32,800 were equipped with the time control mechanism. Thus, it will be seen that since 1931 Steiner has sold 8,200 cabinets and Schwartz 6,600 cabinets of the same type. During that period the Darman Company sold 10,000 and the Simplex Company 5,300 cabinets and no doubt the Burroughs Company and Pull-Clean Company sold some cabinets. Furthermore, during that period due to the depression Steiner had between 25,000 and 28,000 of its cabinets in the hands of linen supply companies and laundries that were not being used and were held in storerooms. This indicates a restricted market.

A salesman for Schwartz testified that 76 per cent of the Schwartz cabinets sold by him were sold to licensees of Steiner and 80 per cent of them had contracts similar to the contract here involved.

The pertinent provisions of the Sherman Act and Clayton Act are set out in Note 9.

■ Section 3 of the Clayton Act does not impinge upon the lawful monopoly granted

---

Licensee will at once return all license numbers, and all royalties accruing for the current year shall immediately become due and payable. While the rights of the Licensee are suspended, because of default, it will not use any of said cabinets or improvements (however the same may be obtained), and any use during the period of suspension shall be deemed an infringement."

9 Section 1 of the Sherman Act (15 U.S.C.A. § 1) in part reads as follows: "Every contract * * * in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

Section 3 of the Clayton Act (15 U.S. C.A. § 14) in part reads as follows: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, * * * on the condition, agreement or understanding that the lessee or

to a patentee, namely, the exclusive right to manufacture, use and vend the patented device. It does not prohibit him from inhibiting the manufacture, use or sale or restricting the manufacture, use or sale of the patented device by others.[10]

It does prohibit the patentee from making a contract which imposes limitations beyond his lawful patent monopoly on the right of his lessee or purchaser to use or deal in goods, wares, merchandise, supplies, or other commodities of a competitor where so to do will substantially lessen competition or tend to create a monopoly.[11]

In General Talking Pictures Corporation v. Western Elec. Co., 58 S.Ct. 849, 82 L.Ed. ——, decided May 2, 1938, the court said (page 852):

"Unquestionably, the owner of a patent may grant licenses to manufacture, use, or sell upon conditions not inconsistent with the scope of the monopoly."

In E. Bement & Sons v. National Harrow Company, 186 U.S. 70, 92, 22 S.Ct. 747, 756, 46 L.Ed. 1058, referring to the Sherman Act, 15 U.S.C.A. § 1 et seq., the court said:

---

purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

[10] General Talking Pictures Corporation v. Western Elec. Co., 58 S.Ct. 849, 82 L.Ed. ——, decided May 2, 1938.

[11] In International Machines Corporation v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085, a lease contract under which the lessee of a patented tabulating machine agreed that the lease should terminate in case any cards not manufactured by the lessor should be used in the leased machine was held to violate Section 3, supra. There the restriction was not upon the use of the patented device itself, but a restriction upon the materials to be employed in the utilization of such device.

In United Shoe Machinery Corporation v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708, a lease of patented shoe machines was involved. It contained certain restrictive clauses as follows: (1) that the leased machinery should not be used upon shoes or parts thereof upon which other operations had been performed with machines other than the lessor's; (2) that if the lessee should fail to use exclusively certain machines made by the lessor the lessor should have the right to cancel the lease; (3) that the lessee should purchase supplies exclusively from the lessor; and (4) that the lessee should use the machines leased only on shoes which had had certain other operations performed on them by the lessor's machines. The clauses were held to violate Section 3, supra. Here again the patentee sought to extend his rights beyond the lawful monopoly of his patent. He restricted not merely the manufacture, use or sale of the patented

device, but the purchase and use of other devices and the purchase of supplies to be used in the operation of the patented device.

In Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959, the patent involved covered that part of the mechanism of motion picture exhibiting machines, which feeds a film through the machine. The Motion Picture Company entered into a license agreement giving a company the right to manufacture and sell machines embodying the invention described and claimed in the patent and in other patents. The license agreement contained a covenant on the part of the licensee that every machine sold by it, except for export, should be sold under "the restriction and condition that such exhibiting or projecting machine shall be used solely for exhibiting or projecting motion pictures containing the inventions" of a certain reissue patent "leased by a licensee of the licensor." The license agreement was held to violate Section 3, supra. After referring to those provisions of the patent statute found in 35 U.S.C.A. §§ 31, 40, the court said:

"Plainly, this language of the statute and the established rules * * * restrict the patent granted on a machine, * * * to the mechanism described in the patent as necessary to produce the described results. It is not concerned with and has nothing to do with the materials with which or on which the machine operates. The grant is of the exclusive right to use the mechanism to produce the result with any appropriate material, and the materials with which the machine is operated are no part of the patented machine or of the combination which produces the patented result. The difference is clear and vital between the exclusive right to use the machine, which the law gives to the inventor, and the right to use it exclusively with prescribed materials."

"But that statute clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor."

In Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 48, 33 S.Ct. 9, 57 L.Ed. 107, the court held that a license agreement which transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it and was designed to and accomplished a restraint of trade condemned by the Sherman Act was invalid.

Does the license agreement here involved impose restraints on the licensee beyond the lawful monopoly of the patents, or restraints that are not reasonably necessary to protect Steiner's rights under the patents?

█ A licensee while exercising under the protection of the patent the rights conferred by his license is estopped to deny the validity of the patent.[12]

█ Under the license agreement here in question the licensee obtains the privilege to use any. or all of the devices covered by all of the Steiner patents, present and future. There is no proof that the licensee was required to take a license covering all of the Steiner patents. Furthermore, he is not required to purchase any particular device or any number of devices.

It should be noted that the restraints in the license agreement are expressly limited to towel cabinets which embody the inventions of the patents and that are *"sold, loaned or leased to the licensee."* (Italics ours.)

The first sentence of paragraph 4(a) goes no further than the estoppel which the law itself imposes upon a licensee. If the licensee accepts the privilege of the license and acquires a cabinet covered by the Steiner patents he agrees not to contest the validity of the patents embodied therein. He is not inhibited either by law or the terms of the contract from challenging the scope of the patent claims. See Westinghouse E. & M. Co. v. Formica Insulation Co., 266 U.S. 342, 351, 45 S.Ct. 117, 120, 69 L.Ed. 316.

The last sentence of paragraph 4(a) undertakes to extend the estoppel beyond the life of the license agreement. It has been uniformly held that a licensee may lawfully agree not to contest the validity of a patent at any time during its term.[13] However, so far as the evidence here discloses, all of the licensees who have acquired towel cabinets embodying the inventions of the Steiner patents and brought themselves within the inhibition of paragraph 4(a) are continuing to exercise the rights and privileges granted by the license agreement. Hence, we regard the question of the validity of a license provision prohibiting the licensee from contesting the validity of a patent embraced in the license even after he has repudiated the license and is no longer exercising rights or receiving benefits thereunder, as not presented on this record and we express no opinion on that question. Moreover, we are of the opinion that the last sentence of paragraph 4(a) applies only to licensees who have purchased, borrowed or leased pursuant to the license, towel cabinets embodying the inventions of the Steiner patents. So construed it merely prohibits a licensee, who has acquired a patented cabinet pursuant to the license and still retains it, from enjoying greater rights or privileges while the license is suspended for breach or after it has been lawfully terminated, than while the license remained in full force and effect. Sus-

[12] Robinson on Patents, Vol. 2, § 820;
Baker Oil Tools v. Burch, 10 Cir., 71 F.2d 31, 35;
National Clay Products Co. v. Heath Unit Tile Co., 8 Cir., 40 F.2d 617, 618;
Pressed Steel Car Co. v. Union Pacific R. Co., 2 Cir., 270 F. 518, 524;
Indiana Mfg. Co. v. Nichols & Shepard Co., C.C.Mich., 190 F. 579, 584;
Regina Music Box Co. v. Newell, C.C. N.Y., 131 F. 606;
United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492.

[13] Eskimo Pie Corporation v. National Ice Cream Co., 6 Cir., 26 F.2d 901, 902;
United Lens Corporation v. Doray Lamp Co., 7 Cir., 93 F.2d 969, 973;
Philadelphia Creamery S. Co. v. Davis & Rankin Bldg. & Mfg. Co., C.C.Ill., 77 F. 879, 882;
Dunham v. Bent, C.C.Mass., 72 F. 60;
Consolidated Rubber Tire Co. v. Finley Rubber Tire Co., C.C.Ga., 116 F. 629, 638;
Hall v. Penley Bros. Co., D.C.Me., 8 F.Supp. 524.

pension for breach or lawful termination of the license should not enlarge the rights of the licensee while he retains devices he has acquired pursuant to the license. Where a contract is fairly susceptible of two constructions, one of which will render it lawful and the other unlawful, the former will be adopted.[14]

In United States v. Standard Oil Company, D.C.Ill., 33 F.2d 617, the license agreements tied the hands and sealed the lips of the only parties who would ordinarily contest the validity of the patents. That is not true here. Schwartz is here contesting their validity. Steiner has an infringement suit now pending against the Darman Company and Steiner has notified the Simplex Company of alleged infringement. The license agreement in Buffalo Specialty Co. v. Gougar, 26 Colo.App. 523, 144 P. 325, went further than the contract in the instant case. The contract there inhibited the licensee not only from contesting the validity but also the scope of the patent claims. Nor is the license agreement here involved like the one before the court in Pope Mfg. Co. v. Gormully, 144 U.S. 224, 12 S.Ct. 632, 36 L.Ed. 414, in that the contract there provided that the licensee should not set up any defense whatever to any suit and that judgment might be entered against him without notice.

Paragraph 4(d) requires the licensee to purchase the patented cabinets and patented improvements only from a manufacturer authorized by the licensor. It is clear that Steiner and its licensees have always construed this provision to refer only to Steiner's patented cabinets and patented improvements, and by its express language it is limited to Steiner's *patented* devices. It does not include other devices or supplies to be used in connection with Steiner's devices. A licensee is free to purchase any other towel cabinet and to purchase his toweling and other supplies from whomsoever he chooses.

True, paragraph 4(d) covers both the patented cabinet and patented improvements therein. But an improvement is not a mere accessory to be used in connection with the cabinet. It is not a material or supply upon which the device of the original patent operates. It involves a change in or addition to the original device which becomes an integral part thereof and enables it to produce its appropriate result in a more perfect or economical way.[15] The licensee is free to use the cabinets with or without the patented improvements. But if he desires to use an improvement he must purchase it from Steiner's manufacturer.

Furthermore, a patentee may condition the right of his licensee to purchase the patented devices. The exclusive right to vend is a part of the patent monopoly. If the patentee grants separate licenses, each covering a single patented device, clearly he may by the terms of each license agreement provide that the device may be purchased only from himself or his authorized manufacturer. Can it be said he could not so restrict the purchase of the devices if he includes both devices in a single license agreement?

Moreover, since the licensee, if he purchases or otherwise acquires a device covered by a patent included in the license is estopped to contest the validity of the patent and the license grants the right to use and not the right to manufacture or purchase except from Steiner or its authorized manufacturer, the licensee could not purchase from others a device covered by a patent embraced in the license without infringing the patent.

---

[14] Fairbanks, Morse & Co. v. City of Wagoner, 10 Cir., 81 F.2d 209, 218;

E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 228, 89 A.L.R. 238;

Intermountain Bldg. & Loan Ass'n v. Gallegos, 9 Cir., 78 F.2d 972, 981;

Hobbs v. McLean, 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940;

Great Northern Ry. Co. v. Delmar Company, 283 U.S. 686, 691, 51 S.Ct. 579, 581, 75 L.Ed. 1349.

[15] Robinson on Patents, at Sec. 210, defines improvement as follows:

"An improvement is an addition to or alteration in some existing means, which increases its efficiency without destroying its identity. It includes two necessary ideas: first, the idea of a complete and practically operative art or instrument, either natural or artificial, as the original to be improved; and second, the idea of some change in such art or instrument, not affecting its essential character, but enabling it to produce its appropriate results in a more perfect or a more economical manner. When such a change involves the exercise of the inventive faculties it is a true invention and is known as an improvement."

See, also, Trott v. Cullen, 10 Cir., 86 F.2d 141, 148.

Therefore, paragraph 4(d) is merely an agreement not to infringe—an agreement to observe a duty which the law itself enjoins. An agreement by a licensee not to infringe the patent covered by the license is valid.[16]

Were paragraph 4(d) construed to embrace Steiner devices after the patents thereon had expired it would constitute an unlawful tying agreement in violation of Section 3, supra. Even if its language permits of that construction, which we doubt, it is susceptible of a construction limiting it to the patented devices and the latter construction which will render it lawful should be adopted. That it is being construed by the parties as limited to patented devices is evidenced by the fact that when a patent expires Steiner notifies the licensee of the expiration and advises the licensee that he is free to use the cabinet without payment of royalties.

Paragraph 6 merely suspends the rights of the licensee for breach. It restricts him from using during the suspension of the license the devices embodying the Steiner patents which he has acquired pursuant to the license agreement.

We conclude that the license agreement does not impose restrictions beyond the lawful monopoly of the patents or that are not reasonably necessary to protect the rights of Steiner under its lawful patent monopoly.

 Furthermore, we entertain grave doubts that the record in this case justifies the finding that these license agreements have tended to lessen competition, or that they have resulted in loss or damage to Schwartz, facts which it was incumbent upon . Schwartz to establish. Standard Oil Company v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; Union Pacific R. Co. v. Frank, 8 Cir., 226 F. 906.

The decree is reversed and the cause remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

### On Petition for Rehearing.

 Schwartz Sales Company has filed a petition for rehearing. It asserts

that to sustain the validity of the claims in suit [17] of reissue patent number 17,352 we have read into the claims the elements of a hinged section and a feed roll adapted to move forward with the hinged section, and that if the claims are so construed its device does not infringe. It is true that in our former opinion herein we referred to the specification and patent drawings which describe and illustrate a movable feed roll and a hinged section. While the language of our opinion was perhaps too general, it was not our intention to limit the claims by the specification or drawings, nor to read into the claims specific elements not present therein. The specification and claims of a patent constitute a contract between the United States and the patentee, and they should be read and construed together, not for the purpose of limiting, contracting, or expanding the claims, but for the purpose of ascertaining from the entire agreement the actual intention of the parties.[18] None of the claims in suit calls for a movement of the feed roll or a hinged joint for the inner section or closure member. That is merely one embodiment of the invention which the drawings illustrate,— one means for permitting forward movement of the inner section and its closure member.

The elements of claim 14 are (1) a towel cabinet comprising an (a) outer and (b) inner section, (2) devices for permitting the inner section to be moved forwardly to provide a hand receiving gap in the rear thereof, (3) a closure member for the rear of the inner section separating the clean and soiled towel, and (4) means including a receiving instrumentality whereby toweling may be fed from said inner section downwardly in the front of the cabinet and thence upwardly in the rear to the receiving instrumentality.

The elements of claim 20 are (1) a towel cabinet adapted to. receive a supply of clean toweling and comprising an (a) outer and (b) inner section, located so as to provide a gap between the inner section and the rear wall of the outer section, (2) a delivery and a take-up feed roll having a driving connection between them for simultaneous movement and mounted in

---

[16] United Lens Corporation v. Doray Lamp Co., 7 Cir., 93 F.2d 969, 973; Daniels v. Brown Shoe Co., Inc., 1 Cir., 77 F.2d 899, 902.

[17] Claims numbered 13, 14, 16, 18, and 20.

[18] Tschappat v. Hinderliter Tool Co., 10 Cir., 98 F.2d 994, decided September 8, 1938; Jensen-Salsbery Lab. v. O. M. Franklin B. Serum Co., 10 Cir., 72 F.2d 15, 19; Callison v. Pickens, 10 Cir., 77 F.2d 62, 64.

said cabinet, (3) a take-up roll for the soiled towel supported to contact with the take-up feed roll, (4) a closure in the rear of the inner section for separating the clean portion of the towel from the soiled portion, and having means to permit its forward movement to temporarily enlarge the gap, and (5) a tension device adjacent to the take-up feed roll and engaging the towel web.

It will be observed that claims 14 and 20 are not limited to means for moving the closure member by a hinged joint, nor to means which effect movement both of the clean towel feed roll and the clean towel roll. The clean towel roll is located in the inner section. The closure member forms the rear of the inner section. When the closure member is moved forward to provide space for insertion of the hand of the attendant the clean towel roll moves forward with the inner section. But this is not necessarily true of its feed roll which is located above the clean towel roll. It seems plain to us that the claims are not limited to the specific devices illustrated in the drawings.

We are of the opinion that a device having ribs which project from the base of the inner section, extend along the sides thereof and travel in grooves or channels in the side walls of the outer section, and by means of which the inner section may be moved back and forth horizontally, responds to the claims in suit equally with one where the inner section may be tipped back and forth on a hinged joint.

The improvement over the prior Steiner patent, number 1,564,292, consists of a new arrangement of the rolls and an inclusion of means which permits the inner section, including the closure member, to be moved sufficiently forward to leave adequate space for insertion of the hand of the attendant, thereby enabling him to thread the open end of the clean towel roll over the various succeeding rolls in the path, the toweling is to travel and to attach it to the take-up or soiled towel roll. The problem was to provide adequate space for the insertion of the attendant's hand. This was accomplished by a rearrangement of the rolls; the clean towel roll was placed at the base of the cabinet in the inner section and the feed roll for the clean towel roll was positioned above the latter. In the prior Steiner patent, number 1,564,292, the feed roll was positioned in the base of the cabinet and the clean towel roll was positioned above it.

This limited the forward movement of the closure element. By placing the clean towel roll in the inner section at the base of the cabinet and by making it movable with the inner section, adequate space is provided for the forward movement of the closure member.

We adhere to our conclusion that reissue patent number 17,352 is valid and infringed by the Schwartz device.

The petition for rehearing is denied.