# FAMILY SAVINGS & LOAN ASSOCIATION SHAREHOLDERS' PROTECTIVE COMMITTEE, Etc., et al. *v.* STEWART et al.

[No. 20, September Term, 1963.]

*Decided October 9, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and MARBURY, JJ.

*H. Don Cummings,* with whom were *Miller, Cummings & Roberts* and *Irving A. Levine* on the brief, for appellants.

*R. Edwin Brown* and *David S. Weinberg,* with whom was *Manuel M. Weinberg* on the brief, for appellees.

PRESCOTT, J., delivered the opinion of the Court.

The chancellor decreed below that the holders of "all Christmas Savings Accounts and all other similar accounts" be paid as general creditors of Family Savings & Home Loan Association, Inc., (the Association), before the distribution of any

of its assets to its shareholders, and the shareholders have appealed.

The question which we must answer is whether the appellees, as the holders of Christmas Club accounts,[1] are entitled to priority in the payment of their claims over the "shareholders" of the association.

The Association was incorporated in 1955, pursuant to Code (1951), Article 23, Sections 140, *et seq.,* (and amendments and additions thereto made prior to said incorporation) to engage in the business of a mutual savings and loan association. Commencing in 1955, it generally solicited and accepted from the public "savings share accounts." [2] Persons who wished to open such acounts executed an application-signature card and were issued a passbook as evidence and record of their deposits, withdrawals and dividends. On the face of this booklet in large letters was written "SAVINGS-SHARE ACCOUNT." Inside the front cover, *inter alia,* it was stated: "This certifies that: "[John Doe] holds a Savings-Share Account in [the Association], subject to its charter and by-laws, and to the laws of the State of Maryland." Sometime thereafter (the record does not make the exact date clear), the application-signature card added to the above, in small lettering, the following: "The official proxy committee of the Association is authorized in my absence to cast my vote or votes at any meeting of the members from year to year until this proxy is cancelled in writing."

---

1. As noted in the first paragraph, there were other "similar" accounts. They have been treated by both sides as raising the same question as the Christmas Clubs. We shall do likewise.

2. Article Fifth of the Articles of Incorporation reads as follows:

"FIFTH: The share capital of the Corporation shall consist of the aggregate of payments *on share accounts and dividends credited thereto,* less redemption and repurchase payments, and shall be divided into shares of a par value of One Hundred Dollars each."

And Article Third states as follows:

"THIRD: * * * (4) to raise its capital, which shall be unlimited, by accepting payments on savings accounts *representing share interest in the association;* * * *."

(All italics added.)

Sometime in 1957, the Association began soliciting variously styled "club accounts," one of which, as we stated in footnote one, was designated the Christmas Club. Persons could open such an account by signing a ledger card which merely stated: "I hereby agree to all the rules and regulations governing this Club." The accounts were advertised and solicited by signs which contained such slogans as, "Don't leave next year's Christmas expenses to chance. Save for them in advance," and "Fill the stockings—Trim the tree * * * Join our Christmas Club." Appellants offered one exhibit dated in 1960, which was a form letter from the President of the Association to "Dear [Christmas Club] member," which solicited future Christmas Club accounts and referred to "Christmas savings." At the bottom of the letter is a printed form addressed to the Association requesting that it "reserve the following Christmas Club share accounts for 1960:" The record fails to make it clear when the Association began to use (or in fact ever did use) this language in its solicitation of club members, or that it ever produced any such members. It was simply a form letter found by the receiver in the files of the Association.

No special written rules were ever promulgated by the Association with reference to these Christmas Club accounts. The account holder was issued a coupon book containing fifty consecutively numbered coupons in the denomination ($1.00, $5.00, etc.) of his club, which served as a receipt for his deposits. This book also contained a form to show the disposition of the funds paid in by the depositor. It first had a blank for the "amount paid in," then a blank for the "dividend or interest added or service charge deducted," and then a blank for the "Total." This was followed by two blanks to show that the funds were either "TRANSFERRED To Savings Shares or Permanent Account," or "Paid by Check or Cash." The evidence makes it clear that the parties intended that ordinarily the club member should make fifty weekly payments on which the Association would pay "dividends or interest," and thereafter the club member could transfer the account to a savings share account or obtain payment by check or in cash.

Savings share account holders could withdraw their savings in any amount at any time. Christmas Club account holders

were not permitted to make partial withdrawals, and they could not make total withdrawals, without proper excuse, before the time named for the fiftieth weekly payment. All club account holders were paid the same "dividend or interest" rate—some 4½% compounded quarterly.

The by-laws of the Association provide for an annual meeting of its members to be held on the third Saturday in December. The record fails to disclose that any such meeting was ever held by the Association.

Pursuant to Code (1962 Cum. Supp.), Article 23, § 160 L, a receiver was appointed for the Association on October 27, 1961, and, after intervening petitions and other pleadings had been filed and a hearing held, the chancellor decreed as we stated in the first paragraph of this opinion.

He based his decision on the fact that there was no provision of law, in the Articles of Incorporation, or in the by-laws that permitted the Association to accept "deposits as such"; hence the Christmas Club accounts were "unauthorized" and the holders thereof must be considered general creditors and given priority over the holders of savings share accounts in the distribution of the assets of the Association. We find it unnecessary to determine whether the Christmas Club accounts were permissible or unauthorized. For the purposes of this case, we shall assume, without deciding, that they were authorized.

Although Mr. Sundheim names an early origin (about 200 B. C.) for building and loan associations,[3] there is a dearth of decisions directly in point on the question to be answered herein. And those that bear an analogy must be carefully considered in the light of the statutory, charter and by-law provisions specifically relating thereto. Sundheim states that such associations are private corporations for profit, but hastens to inform his readers that it is impossible to define a building and loan association so as to include the different types throughout the world, or even in the United States. The ones that have been organized for the benefit of their shareholders encourage thrift, and in former times generally the purchase or construction of homes by members. At present, however, many of the associa-

---

3. Sundheim, Building and Loan Associations (3rd Ed.), § 1.

tions conduct their affairs so that the loans made by them are to others than their members and for purposes other than obtaining or constructing homes. The learned author named above lists eight different classifications (in § 10) to describe some of the plans under which these corporations operate, and then explains them.[4]

Membership in such an association may be acquired in the same manner in which membership may be acquired in other corporations; namely by becoming the holder of its stock. 12 C.J.S., *Building & Loan Associations,* § 16; *Endlich, Building Associations* (2nd Ed.), § 45; *Sundheim, Building & Loan Associations* (3rd Ed.), § 22. Cf. *Ash v. Citizens B. & L. Ass'n,* 225 Md. 395, 170 A. 2d 750. (For additional methods of becoming members in Maryland, but not here involved, see Code (1957), Article 23, § 157.) And there is no substantial difference between free shareholders and stockholders. *Ash v. Citizens B. & L. Ass'n, supra; First Nat'l. Bank v. Dawson* 213 P. 1097 (Mont.). Cf. *Coltrane v. Blake,* 113 F. 785, 787 (C. A., 4). Every member or shareholder is entitled to the same rights and privileges, and must bear the same burdens as every other member or shareholder holding the same class of investment security. The shareholders have the same rights as stockholders in ordinary corporations for profit, except in so far as they may be enlarged or restricted by special legislation, the Statute under which the corporation is incorporated, its charter or its by-laws. *Sundheim, op. cit.,* § 25. In other words, the members or shareholders own the association and are entitled to conduct its affairs through their officers and Board of Directors. Cf. Code (1957), Article 23, § 157.

There are, however, certain rights that are peculiar to members of building and loan and savings and loan associations not known in ordinary corporations, such as the right to withdraw at any time upon notice, if required, (when the association is solvent) and, under certain circumstances, the right to

---

4. See also Sause, "Building Association History," 22 Md. L. Rev. 1 and 91. At present in Maryland, the "savings and loan business" comprises "the building, savings and loan or homestead business." Code (1962 Cum. Supp.), Article 23, § 160 A.

receive a loan. Generally speaking, such associations are mutual enterprises with all members being under the same rules, sharing in the profits equally and bearing their proportionate share of the losses. Endlich, *op. cit.,* § 514. There are two additional differences between ordinary business corporations and mutual savings and loan associations that seem appropriate to be mentioned: in the former, the stock is usually paid for in full at the time of its purchase, whereas in the latter the stock is frequently purchased by installment payments; and in the former the stockholders are the proprietors of the corporation, while in the latter the shareholders are not only proprietors, but in the absence of insolvency, they have the right to withdraw, at any time in accordance with law and the by-laws of the association, the funds paid in by them dollar for dollar. This latter right makes the shareholder in the association, at least under certain circumstances, a creditor of the association as well as a shareholder thereof. As stated by Justice Holmes in *Atwood v. Dumas,* 21 N. E. 236 (Mass.) : "But the interest of the member of a corporation of this kind [a co-operative savings fund and loan association] is of a peculiar nature, and it does not follow, because the defendant is a member, that she may not be a creditor also in respect of her money paid in * * *." See also *Benton's Apparel, Inc., v. Hegna,* 7 N. W. 2d 3 (Minn.), and compare *Morris Resnick B. & L. Ass'n v. Barnes,* 164 A. 358 (Pa. Super.); *Aberdeen S. & L. Ass'n v. Chase,* 289 P. 536 (Wash.); *Ohio Valley B. & L. Ass'n v. County Court,* 26 S. E. 203 (W. Va.); *In re Western States B-L Ass'n,* 50 F. 2d 632 (D. C., Cal.).

We turn now to a consideration of the actual question presented. Appellants are members and free shareholders of the Association (or representatives thereof) and they concede that the savings share account holders were owners and proprietors of the Association as well as creditors thereof (at least as long as the Association was solvent), but they contend that there is no material distinction between savings share account holders and Christmas Club account holders "either in the nature of the contract entered into by them, in their manner of treatment by the Association or under the applicable law." In other words, they claim, in effect, that the Christmas Club account owners

are also free shareholders of the Association, and, as such, were also owners and proprietors of the Association, and, therefore, are only entitled to share *pro rata* with appellants the assets of the Association, after the payment of proper costs and general creditors. *Frederick v. Lyons,* 173 Md. 95, 194 A. 815. *Balto. Bldg. Ass'n v. Powhatan Co.,* 87 Md. 59, 39 A. 274.

In order to determine the relationship between the Association and the Christmas Club account holders, it is necessary to decide what the contract between them was. To do this, we must examine the law, the Articles of Incorporation, the by-laws and the dealings between the parties, and, as the ambiguous written provisions of the contract (meagre as they are) were furnished by the Association, these provisions and the dealings between the parties must be liberally construed in favor of the appellees.[5] An analysis thereof discloses, we think, quite a number of reasons why the appellees were not members or free shareholders of the Association.

When practically all, if not all, of the payments on the Christmas Club accounts were accepted, the only law that explicitly mentioned such clubs with relation to building and homestead associations was what is now Code (1957), Article 23, Section 160. It did not specifically authorize the acceptance of payments on such accounts, but it implicitly acknowledged the legality thereof, at least if authorized by the charter or by-laws of the association (no such specific authorization being involved herein). It provided, and still provides, that it shall be lawful for any "association formed under this subtitle" to forego the payment of dividends from "time to time on their 'Christmas' and/or 'vacation clubs' funds in account with them, but said association may pay dividends on other funds in account with them during the same dividend period." This is a clear legislative manifestation of a difference between the funds accepted in the Christmas Club accounts and those received in the savings share accounts. If they were one and the same, the above would amount to a legislative attempt to destroy one of the fundamental concepts of mutual savings and loan associa-

---

5. Griffin v. White, 189 S.E. 127, 135 (S. C.). Cf. Penn., Etc., Ins. Co. v. Shirer, 224 Md. 530, 537.

tions—that of equality of treatment to all holding the same class of investment security. *Balto. Bldg. Ass'n v. Powhatan Co., supra,* pp. 64, 65. *Sundheim, op. cit.,* § 25; *Endlich, op. cit.,* § 514; *Securities & Exch. Com. v. American Internat'l S. & L. Ass'n,* 199 F. Supp. 341. For it is obvious that if dividends be withheld on certain funds but paid for the same period of time on other funds, the latter receive a marked advantage over the former.

But, argue the appellants, the amendments of 1961 to Article 23 are "applicable to the association," for Section 160B (b) states that the provisions of "this article shall be applicable to all associations heretofore or hereafter organized under the laws of this State," and Section 160A (f) states that, except as provided in Section 160P (which permits guaranty stock), all associations shall have but one kind or class of *shares of stock,* and the holders of said shares shall have equal rights as to *voting, earnings* and *assets;* consequently the holders of Christmas Club accounts must be determined to stand on the same basis as the free shareholders. With this conclusion, we are unable to agree.

Assuming the amendments of 1961 are applicable (Chapter 1 of the Acts of 1961, Sp. Sess., was approved on June 12, 1961; the receiver herein was appointed on October 27, 1961), we find nothing therein that requires a holding that the Christmas Savings accounts holders are free shareholders.[6] Section 160A (f) does not refer to the Christmas Club accounts or say that the holders thereof *shall be* shareholders, it merely states that associations (with the exception noted) shall have only one class of *shares of stock,* and it seems clear, we think, from the statetment of facts and Code (1951), Article 23, Section 152, which we shall refer to later, that the holders of the Christmas Club accounts were never intended to vote or participate in the earnings, as such, of the Association. This conclusion is bolstered by the fact that many of the subscribers to the Christmas Club (hereafter sometimes merely "Club") accounts never

6. It will be noted that Section 160P makes provision for the amendment of charters of previously formed associations under certain circumstances.

accumulated credits to the amount of the par value of one share of stock, and the statement on the coupon book "TRANS-FERRED To Savings Shares or Permanent Account," *supra,* shows a clear intention of the parties that the Club account holders could, if they desired, transfer the funds accumulated therein to savings share accounts. If they were already free shareholders, there would seem to be no necessity for such a transfer. Also, the by-laws provided for an annual meeting of stockholders late in December of each year, and, as the name Christmas Club implies, many of such accounts would be closed before the annual meetings (if any had been held). In addition, Section 160Y under the heading "Definite rate securities forbidden" provides that no association shall issue, sell, negotiate, or advertise for sale any type of investment security other than free share accounts, guaranty stock (defined in Section 160P), and Christmas and/or vacation club funds in account with it, and no association shall agree to pay "on any free share account" a rate or amount, in dividends or other distribution, which is fixed. Here, again, is a clear legislative manifestation of a distinction between the "free share account[s]" and the " 'Christmas' and/or 'vacation club' funds in account with it [the association]." The first provision makes an explicit distinction between the two, and the second provision prevents an association from agreeing to pay its free shareholders any "fixed" amount as dividends, said amount being ordinarily determined by the amount of profits. This second provision, by specifically denying to an association the right to agree to pay its free shareholders any fixed amount of dividend and remaining silent with reference to Christmas Club accounts, would seem to imply that the association validly could agree to pay a fixed amount of interest on the Club accounts. If the holders of the Club accounts were free shareholders this, again, would attempt to destroy the indispensable attribute of building and loan associations: that of equality among the holders of the same type of investment security. And the action of the Association in soliciting proxies from the holders of Savings share accounts but not from the holders of Club accounts is another indication that the Association did not anticipate the latter holders to participate in the management of the Association.

In addition, Section 152 of the 1951 Code (now Section 157) and Section 160Q of Chapter 1 of the Acts of 1961, Sp. Sess., state who shall constitute the membership in associations and their respective voting rights. Neither refers specifically to Club accounts, although as we noted above, both Sections 160 and 160Y specifically refer to them by name. We conclude, therefore, that the Legislature did not intend to make the holders of Club accounts members or shareholders in the Association, with the privilege of sharing in the management thereof or its earnings as such. And, without repeating them here or setting them forth in full, we find nothing in the charter, by-laws, scanty wording on the coupon book, or the conduct of the parties that indicates that Club account owners were to so participate. Without these privileges, they cannot rightfully be held to be shareholders in the Association. *Intermountain B. & L. Ass'n v. Gallegos,* 78 F. 2d 972 (C. A. 9).

We find considerable analogy in the case of *Polish-American B. & L. Assn v. Dembowczyk,* 167 Md. 259, 173 A. 254, to the case at bar. There, the association conducted a building and loan association business. It had free shareholders and it advertised for and received deposits of "Christmas savings." Appellee opened an account and was issued a passbook on the inside of which was "Saving's Account No. ............" The question involved was whether the appellee "turned her money over to the [association] as a savings depositor, or did she by so doing * * * become a 'free shareholder' in the corporation?" The trial judge issued a declaratory decree declaring that the appellee was a general creditor, and not a free shareholder, of the association, and, as such, was entitled to be paid "before any payments are made to free shareholders." This Court affirmed, holding that appellee was a savings depositor, and, as such a creditor of the association, entitled to be paid in full before anything was paid to the shareholders. As stated by the court *In re Commuters B. & L. Ass'n,* 4 A. 2d 615 (Pa. super.) : "The decisions are clear that on the distribution of the assets of a building and loan association creditors, whose claims did not arise from the ownership of stock in the association, are entitled to be paid before 'creditors' whose claims arose out of ownership of stock * * *." See also *Cook v. Emmet*

*Bldg. Assn.,* 90 Md. 284, 44 A. 1022; *Steinberger v. Savings Asso.,* 84 Md. 625, 634, 36 A. 439.

There are, perhaps, many of the actual free shareholders who did not, and do not, know their legal rights and responsibilities as such shareholders. They, of course, had the right to require the holding of the annual meetings of stockholders as prescribed by the by-laws. They had the right to attend and participate therein, to vote for the directors and generally to supervise and manage the affairs of the Association, while the holders of the Club accounts had no such rights or privileges. However, the fact that the shareholders did not know their legal rights, or failed to exercise them, cannot alter the relationship between the Association and its creditors.

From what has been said above, the decree must be affirmed.

> *Decree affirmed; appellants to pay the costs.*